**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

R.J. REYNOLDS TOBACCO COMPANY;
LORILLARD TOBACCO COMPANY;
R. J. REYNOLDS SMOKE SHOP, INC.,
*Plaintiffs-Appellants,*

v.

SANDRA SHEWRY, Director of the
California Department of Health
Services; DILEEP G. BAL, Acting
Chief of the Tobacco Control
Section of the California
Department of Health Services;
STATE OF CALIFORNIA,
*Defendants-Appellees.*

No. 03-16535

D.C. No.
CV-03-00659-LKK

ORDER DENYING
PETITIONS FOR
REHEARING EN
BANC AND
AMENDING
OPINION AND
DISSENT AND
AMENDED
OPINION AND
AMENDED
DISSENT

Appeal from the United States District Court
for the Eastern District of California
Lawrence K. Karlton, Senior Judge, Presiding

Argued and Submitted
May 10, 2004—San Francisco, California

Filed September 28, 2004
Amended September 9, 2005

Before: Betty Binns Fletcher, Stephen Trott and
Raymond C. Fisher, Circuit Judges.

Opinion by Judge Fisher;
Dissent by Judge Trott

12895

**COUNSEL**

H. Joseph Escher III, Howard Rice Nemerovski Canady Falk
& Rabkin, San Francisco, California, for plaintiffs-appellants

R.J. Reynolds Tobacco Company and R.J. Reynolds Smoke Shop, Inc., and Shannon L. Spangler and M. Kevin Underhill, Shook, Hardy & Bacon, San Francisco, California, for plaintiff-appellant Lorillard Tobacco Company.

Robert M. O'Neil and J. Joshua Wheeler, Charlottesville, Virginia, for amici curiae Thomas Jefferson Center for the Protection of Free Expression and the Media Institute, in support of the plaintiffs-appellants.

Daniel J. Popeo and Richard A. Samp, Washington, D.C., for amici curiae Washington Legal Foundation, in support of the plaintiffs-appellants.

Karen Leaf, Deputy Attorney General, Sacramento, California, for the defendants-appellees.

Deborah B. Caplan and Robert S. McWhorter, Olson, Hagel & Fishburn, LLP, Sacramento, California, for amici curiae American Cancer Society, California Division, Inc., American Heart Association, Western States Affiliates, and American Lung Association of California, in support of the defendants-appellees.

---

## ORDER

In light of the Supreme Court's decision in *Johanns v. Livestock Marketing Ass'n*, 125 S. Ct. 2055 (2005), the opinion and dissent filed on September 28, 2004, and appearing at slip op. 14,067, 384 F.3d 1126 (9th Cir. 2004), and slip op. 14,096, 384 F.3d 1126, 1142, respectively, are amended as follows:

At slip op. 14,095, line 31, insert the following postscript after "we affirm the judgment of the district court." and before "AFFIRMED.":

**POSTSCRIPT**

After we filed our opinion, the Supreme Court decided *Johanns v. Livestock Marketing Ass'n*, 125 S. Ct. 2055 (2005), holding that the Beef Promotion and Research Act of 1985 did not violate the First Amendment by imposing an assessment on all sales and importation of cattle to fund beef promotional campaigns with which many of the assessed parties disagreed. The Court reasoned, as we do here, that the Act was not susceptible to a First Amendment compelled-subsidy challenge because the assessments funded government speech. Although the *Johanns* opinion affirms our reasoning, Judge Trott remains in dissent. He would now remand to the district court pursuant to the Court's statement in *Johanns* that an as-applied challenge might lie "if it were established . . . that individual beef advertisements were attributed to respondents." *Id.* at 2065.

Appellants have never, before us or the district court, claimed that the ads at issue in this litigation could be or were attributed to them; nor does the record reveal a material question of fact on the issue. A reasonable viewer could not believe that these anti-industry ads, expressly identified as "Sponsored by the California Department of Health Services," were created, produced or approved by the appellants. The ad singled out by the dissent as "put[ting] [words] directly into the mouth of the tobacco industry," for example, is unmistakable satire. In that ad, children play in a schoolyard while cigarettes fall like rain from the sky and a voiceover states "[w]e have to sell cigarettes to your kids. We need half a million new smokers a year . . . so we advertise near schools, at candy counters." No reasonable viewer could overlook the satirical tenor of this ad and attribute the voiceover text to actual tobacco executives.

We also find inapposite the dissent's analogy to our recent order in *Charter v. United States Department of Agriculture*, 412 F.3d 1017 (9th Cir. 2005). We remanded on the question

of attribution in that case because the record indicated that the National Cattlemen's Beef Association "routinely, before Congress, and in other public ways and in press announcements, states that it is the trade organization and marketing organization of America's one million cattle producers." *Id.* at 1019. The record in this case contains no evidence that the state ever attributed its ads to the appellants or that a reasonable viewer could have done so; accordingly, we reject the analogy to *Charter* and decline Judge Trott's invitation to remand.

At slip op. 14,108, line 8, insert the following postscript after "is without merit.":

## POSTSCRIPT

Shortly after I circulated this dissent, the Supreme Court decided *Johanns v. Livestock Marketing Ass'n*, 544 U.S. _____, 125 S.Ct. 2055 (2005). For the majority of the Court, Justice Scalia wrote:

> The compelled-*subsidy* analysis is altogether unaffected by whether the funds for the promotions are raised by general taxes or through a targeted assessment. Citizens may challenge compelled support of private speech, but have no First Amendment right not to fund government speech. And that is no less true when the funding is achieved through targeted assessments devoted exclusively to the program to which the assessed citizens object. The *First Amendment* does not confer a right to pay one's taxes into the general fund, because the injury of compelled funding (as opposed to the injury of compelled speech) does not stem from the Government's mode of accounting.

*Id.* at _____ (second emphasis added) (citations omitted).

Not surprisingly, California's Attorney General suggests that this ruling "eliminates all possible doubt about the correctness" of the majority's decision. I do not agree.

The *Johanns* Court suggests, while "express[ing] no view on the point," that if it were to be shown that the challenged speech would "convince *a reasonable factfinder*" that "all . . . producers[ ] would be tarred with the content of each trademarked ad," an "as applied" First Amendment challenge might lie. *Id.* at _____. (emphasis added).

Writing separately, Justice Thomas advanced the same suggestion:

> Still, if the advertisements associated their generic pro-beef message with either the individual or organization respondents, then respondents would have a valid as-applied *First Amendment* challenge. The government may not, consistent with the *First Amendment*, associate individuals or organizations involuntarily with speech by attributing an unwanted message to them, whether or not those individuals fund the speech, and whether or not the message is under the government's control. This principle follows not only from our cases establishing that the government may not compel individuals to convey messages with which they disagree, . . . but also from our expressive-associate cases, which prohibit the government from coercively associating individuals or groups with unwanted messages.

*Id.* at _____. (emphasis added) (citations omitted).

Here, one challenged government television ad — described by my colleagues as "particularly striking" — uses a voice-over technique to speak to the public on behalf of the tobacco industry. The words put directly into the mouths of the tobacco industry disparagingly associate the appellants

and the industry with the unwanted message about which they now complain:

> *We* have to sell cigarettes to your kids. *We* need half a million new smokers a year just to stay in business so *we* advertise near schools, at candy counters. *We* lower our prices. *We* have to. It's nothing personal. You understand.

The "we" is the appellants.

If this language, albeit couched in a literary device, does not "tar all in the industry" required to pay for the ad, and if this language does not "coercively associate" and intentionally smear the appellants — all of them — with an "unwanted message" to which they object, it is hard to know what does. I respectfully disagree with the district court's preemption of this issue as a matter of law. The facts are such as to survive summary judgment and should be submitted — as suggested by the Supreme Court — to a factfinder.

At the very least, we should take our lead from our recent decision in *Charter v. United States Department of Agriculture*, _____ F.3d _____, _____ (9th Cir. 2005), recognizing the difference between that case and *Johanns* with respect to a possible attribution/association "as applied" challenge:

> In light of the Supreme Court's recognition [in *Johanns*] (without expressing a view on the issue) that an attribution claim might form the basis for an as-applied First Amendment challenge to the Act, the district court's decision must be vacated and the case remanded for further proceedings to determine, among other things, whether speech was attributed to appellants and, if so, whether such attribution can and does support a claim that the Act is unconstitutional as applied. *Id.*; *see also id.* at *9 n.* (Thomas, J., concurring) (noting that, pursuant to Federal Rule

of Civil Procedure 15, "on remand respondents may be able to amend their complaint to assert an attribution claim").

There is a world of difference between what was at issue and at stake in *Johanns* and what is on our docket here. In *Johanns*, the question was whether, consistent with the First Amendment, the government could compel beef producers to fund by way of mandatory assessments a generic advertising program promoting the sale of beef. 7 U.S.C. § 2901(b). In our case, however, the purpose of the coerced speech is deliberately destructive of those forced to pay for it — not so in *Johanns*. Does this difference matter here? I believe it does. The difference is not just one of degree, but of material kind. It is one thing to promote the sale of an agricultural product; it is altogether another to attempt to destroy an entire legal industry.

I see this case as distinguishable from *Johanns*, and I continue respectfully to dissent. In my view, we should remand to the district court for reconsideration on the "as applied" issue as newly articulated in *Johanns* itself.

With these amendments, the panel judges have voted to deny appellants' petition for panel rehearing. Judge Fisher has voted to deny the petition for rehearing en banc, and Judges Fletcher and Trott so recommend.

The panel judges have voted to deny the petition for panel rehearing of amicus curiae Washington Legal Foundation. Judge Fisher has voted to deny the petition for rehearing en banc, and Judges Fletcher and Trott so recommend.

The full court has been advised of the petitions for rehearing en banc and no judge of the court has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35.

Appellants' petition for panel rehearing and petition for rehearing en banc, filed October 19, 2004, is **DENIED**.

The petition for panel rehearing and rehearing en banc of amicus curiae Washington Legal Foundation, filed October 27, 2004, is **DENIED.**

No further petitions for rehearing or petitions for rehearing en banc will be considered.

---

# OPINION

FISHER, Circuit Judge:

We deal here with a novel First Amendment claim. The appellants, three tobacco companies, claim that California violated their First Amendment rights by imposing a surtax on cigarettes and then using some of the proceeds of that surtax to pay for advertisements that criticize the tobacco industry. The tobacco companies argue that this is a case of compelled subsidization of speech prohibited by the First Amendment, analogous to *United States v. United Foods, Inc.*, 533 U.S. 405 (2001). California counters that the advertisements are government speech entirely immune from First Amendment attack.

The tobacco companies concede that (1) the imposition of the tax itself is not unconstitutional and (2) the message produced by the government's advertisements creates no First Amendment problem apart from its method of funding. Rather, they argue for an independent First Amendment violation based on the close nexus between the government advertising and the excise tax that funds it. We reject this argument as unsupported by the Constitution and Supreme Court precedent, and as so unlimited in principle as to threaten a wide range of legitimate government activity. We also reject the tobacco companies' claim that the advertisements violated

their rights under the Seventh Amendment or the Due Process Clause. We thus affirm the district court.[1]

## FACTUAL AND PROCEDURAL BACKGROUND[2]

In 1988, California voters approved Proposition 99, a statewide ballot initiative also known as the "Tobacco Tax and Health Protection Act of 1988." Cal. Rev. & Tax Code §§ 30121-30130. The Act imposes the Cigarette and Tobacco Products Surtax ("the surtax"), a 25-cent per-pack surtax on all wholesale cigarette sales in California.

The revenue generated by the surtax is placed in the "Cigarette and Tobacco Products Surtax Fund." Twenty percent of taxes in the surtax fund is allocated to a "Health Education Account," funds from which are only "available for appropriation for programs for the prevention and reduction of tobacco use, primarily among children, through school and community health education programs." *Id.,* § 30122(b)(1).

In order to implement Proposition 99, the California Legislature directed the California Department of Health Services ("DHS") to establish "a program on tobacco use and health to reduce tobacco use in California by conducting health education interventions and behavior change programs at the state level, in the community, and other nonschool settings." Cal. Health & Safety Code § 104375(a). As part of this program, called the "Tobacco Control Program," the DHS is required to develop a media campaign designed to raise public awareness of the deleterious effects of smoking and to effect a reduction in tobacco use. *Id.,* §§ 104375(b), (c), (e)(1) & (j);

---

[1]We note that the district court issued a particularly thoughtful, thorough and comprehensive opinion in this case, upon which we have substantially relied even though we do not adopt all of its reasoning.

[2]Because this case comes before us on the state's motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), we accept as true all allegations in the tobacco companies' complaint.

104385(a); 104400. The Tobacco Control Program is funded entirely with money from the Health Education Account — and thus, ultimately, exclusively from the proceeds of the surtax.

This case concerns certain advertisements the DHS produced as part of its Tobacco Control Program. According to the tobacco companies, the DHS concluded soon after the establishment of the Tobacco Control Program that a media campaign focused solely on presenting the health risks of tobacco use would be of limited utility in reducing the incidence of smoking in California, because people tend to "tune out" advertising that simply explains the health risks involved with tobacco use. Thus, the DHS concluded that, in order to carry out its mandate to encourage Californians to modify and reduce their use of tobacco, it would be necessary to launch a campaign to "denormalize" smoking, by creating a climate in which smoking would seem less desirable and less socially acceptable.

One method used by the DHS in this campaign has been to portray the tobacco industry itself as deceptive and as an enemy of the public health, or, in the companies' words, to attack not "the desirability of a product but . . . the moral character of [the] industry, accusing it of hypocrisy, cynicism and duplicity." The district court described these advertisements as follows:

> A recent round of television commercials features an actor playing a public relations executive for the fictional cigarette brand "Hampton," detailing for viewers his unseemly methods for getting people to start smoking. The ads end with the tagline, "Do You Smell Smoke?," implicitly referencing both cigarette smoke and a smoke-and-mirrors marketing strategy. Another ad portrays tobacco executives discussing how to replace a customer base that is dying at the rate of 1,100 users a day. Some of the ads end with

images of mock warning labels such as: "WARN-
ING: The tobacco industry is not your friend."; or
"WARNING: Some people will say anything to sell
cigarettes." Several spots suggest that tobacco com-
panies aggressively market to children. In one partic-
ularly striking television ad entitled "Rain," children
in a schoolyard are shown looking up while ciga-
rettes rain down on them from the sky. A voice-over
states "We have to sell cigarettes to your kids. We
need half a million new smokers a year just to stay
in business. So we advertise near schools, at candy
counters. We lower our prices. We have to. It's noth-
ing personal. You understand." At the conclusion,
the narrator says, "The tobacco industry: how low
will they go to make a profit?"

*R.J. Reynolds v. Bonta*, 272 F.Supp. 2d 1085, 1089 (2003).
The district court also noted that each of the challenged adver-
tisements is "identified as 'Sponsored by the California
Department of Health Services.' " *Id.* The tobacco companies
do not claim that these advertisements contain any affirma-
tively false statements.

That California itself is interested in the outcome of the
campaign is made clear by the Legislature's finding that
"[s]moking is the single most important source of preventable
disease and premature death in California" and that prevent-
ing tobacco use by children and young adults is the "highest
priority in disease prevention for the state of California." Cal.
Health & Safety Code § 104350(a). The district court
explained that "there is substantial evidence, including pub-
lished medical studies, indicating that the Proposition 99 pro-
grams, and the media campaign in particular, have been
successful in achieving their goals." *Bonta*, 272 F. Supp. 2d
at 1088 n.5 (noting the following articles describing the suc-
cess of California's campaign in reducing the incidence of
smoking: C. Fichtenberg and S. Glantz, *Association of the
California Tobacco Control Program with Declines in Ciga-*

*rette Consumption and Mortality from Heart Disease*, New Eng. J. Med. 343:24, 1772-1777 (2000); M. Siegel, *Mass Media Antismoking Campaigns: A Powerful Tool for Health Promotion*, Annals of Internal Med., 129:2, 128-132 (1998); J.P. Pierce, et al., *Has the California Tobacco Control Program Reduced Smoking?,* JAMA 280:10, 893-899 (1998)).

The appellant tobacco companies here are R.J. Reynolds Tobacco Company; its wholly owned subsidiary R.J. Reynolds Smoke Shop, Inc.; and Lorillard Tobacco Company. R.J. Reynolds pays the surtax through sales from its smoke shop subsidiary; Lorillard pays the surtax in connection with certain of its research and marketing activities in California. These companies are not the most important sources of revenue for the surtax, however. Because the surtax is imposed on distributors of cigarettes, most surtax payments are made not by cigarette manufacturers themselves, but by cigarette wholesalers. Nonetheless, because the tobacco companies sell or provide small quantities of cigarettes directly to smokers in California, they have paid and will in the future be required to pay the surtax. The tobacco companies here paid approximately $14,000 in surtax funds, thus contributing approximately $2,800 of the $25 million spent on the challenged ads. *Bonta*, 272 F. Supp. 2d at 1090.

The tobacco companies brought five causes of action against the state defendants ("the state" or "California") to the district court, seeking both injunctive and declaratory relief. They argued that the use of the surtax to fund the "anti-industry" advertisements violated the First Amendment, that the advertisements improperly stigmatized them in violation of the Fourteenth Amendment, that the advertisements interfered with their right to a jury trial under the Seventh and Fourteenth Amendments and that the advertisements violated the California Constitution.[3] The state moved to dismiss under

---

[3]This state law claim is not before us.

Federal Rule of Civil Procedure 12(b)(6). The district court dismissed with prejudice all of the companies' federal constitutional claims, and the companies timely appealed.

## DISCUSSION

### I.  First Amendment

We begin by addressing the scope of the First Amendment issue. The tobacco companies do not raise a First Amendment challenge to California's right to sponsor "anti-industry" advertisements. As their brief to this court puts it, "if the broadcasts were funded by general taxes rather than by a tax imposed exclusively on the tobacco industry, the anti-industry ads would raise no First Amendment issue." Nor do the companies argue that the surtax *itself* has interfered with their constitutional rights. *See, e.g.*, *Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 227-29 (1987) (invalidating a statute that granted a tax exemption for religious, professional, trade and sports journals that did not apply to other journals); *Minneapolis Star & Tribune v. Minn. Comm'r of Revenue*, 460 U.S. 575, 591-93 (1983) (invalidating a special tax on the press limited to only a few newspapers). Their claim is specific: they argue that using the money raised from an excise tax that targets the tobacco industry to pay for advertising that denigrates the industry violates their constitutional rights.

Before discussing the precedent upon which the tobacco companies rely, we note that this is a novel argument. At issue is neither the government's power to speak nor the government's power to tax. Chief Justice John Marshall famously stated that "the power to tax involves the power to destroy." *McCullough v. Maryland*, 17 U.S. (4 Wheat.) 316, 431 (1819). According to the tobacco companies, however, this case involves neither an invalid exercise of the government's power to tax nor a claim that they have been destroyed by the government's speech. Rather, the companies claim a constitutional violation in the link between the excise tax and the gov-

ernment speech to which they object. By suggesting that certain taxpayers should be able to object to government speech whenever an excise tax is used to fund a message that particularly affects the group that pays the tax, the tobacco companies' argument would implicate a range of other programs. As we shall explain, we reject the "nexus" argument as applied to excise taxation. A mere link between an excise tax and a government-sponsored advertising campaign, absent a claim that either the tax or the advertising is unconstitutional, does not violate the First Amendment.

## A.   *United Foods*, the Compelled Speech Doctrine and Taxation

The tobacco companies rely in large part upon one case: *United States v. United Foods, Inc.*, 533 U.S. 405 (2001).[4] We do not agree that *United Foods* controls. Rather, we conclude that the compelled speech cases, of which *United Foods* is one, do not apply where an excise tax is used to produce a message that indisputably comes from the government itself.

In *United Foods*, the Court considered a federal program created by the Mushroom Promotion, Research, and Consumer Information Act, 7 U.S.C. § 6101 *et seq.* As the Court described the program,

> The Act authorizes the Secretary of Agriculture to establish a Mushroom Council to pursue the statute's goals. Mushroom producers and importers, as defined by the statute, submit nominations from among their group to the Secretary, who then desig-

---

[4]The Supreme Court has recently granted certiorari in *Livestock Mktg. Ass'n v. USDA*, 335 F.3d 711 (8th Cir. 2003), *cert. granted sub nom. Veneman v. Livestock Mktg. Ass'n*, 124 S. Ct. 2389, 72 U.S.L.W. 3721 (U.S. May 24, 2004) (No. 03-1164) and *Nebraska Cattlemen, Inc. v. Livestock Mktg. Ass'n*, 124 S.Ct. 2390, 72 USLW 3539 (U.S. May 24, 2004), involving the interaction between the compelled speech and government speech doctrines.

nates the Council membership. To fund its programs, the Act allows the Council to impose mandatory assessments upon handlers of fresh mushrooms in an amount not to exceed one cent per pound of mushrooms produced or imported. The assessments can be used for "projects of mushroom promotion, research, consumer information, and industry information." It is undisputed, though, that most moneys raised by the assessments are spent for generic advertising to promote mushroom sales.

533 U.S. at 408 (citations omitted). The petitioner in that case was a mushroom producer that refused to pay its mandatory assessment. The Supreme Court described the question presented as "whether the government may underwrite and sponsor speech with a certain viewpoint using special subsidies exacted from a designated class of persons, some of whom object to the idea being advanced." 533 U.S. at 410. Under the facts of *United Foods*, the Supreme Court held that the answer to that question was "no." The Court held that by requiring the mushroom producer to contribute to generic advertisements for mushroom sales to which it objected, the government had put "First Amendment values . . . at serious risk" by "compell[ing] a discrete group of citizens [ ] to pay special subsidies for speech on the side that [the government] favors." *Id.* at 411.

Read broadly, and taken in isolation, this language might plausibly suggest that the tobacco companies have the right to object to the advertisements at issue here because they have paid "special subsidies" for the advertisements in the form of a tax that disproportionately affects them. Yet *United Foods* also makes clear that not every case in which the government mandates support for speech from a particular group necessarily creates a First Amendment violation. Most importantly, the Court specifically declined to address whether the same First Amendment analysis would apply to cases in which the speech produced was "government speech" that derived from

the state itself and not the Mushroom Council. *See id.* at 416 ("The Government argues the advertising here is government speech, and so immune from the scrutiny we would otherwise apply. As the government admits . . . however, this argument was not raised or addressed in the Court of Appeals.") (citations omitted). *United Foods* also carefully relied on the teaching of previous compelled speech cases to reach its holding about the contributions to the Mushroom Council. *Id.* In order to understand the impact of *United Foods*, therefore, we examine the origins and the purpose of the compelled speech doctrine.

**[1]** It has long been established that the First Amendment prohibits the government from compelling citizens to express beliefs that they do not hold. "[T]he right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977) (forbidding a state government from compelling motorists to display the message "Live Free or Die" on their license plates)*; see also West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943) (preventing a state government from forcing children to salute the American flag when the children's religious beliefs forbade such behavior). These cases are not directly applicable here because there is no claim that the tobacco companies have been forced into expressing any position.

The Court extended this fundamental principle of freedom of expression to situations "involving expression by groups which include persons who object to the speech, but who, nevertheless, must remain members of the group by law or necessity." *United Foods*, 533 U.S. at 413. The first such case, *Abood v. Detroit Board of Education*, 431 U.S. 209 (1977), involved a challenge by public school teachers to a collective bargaining agreement. The agreement required non-union members who were represented by the teachers union to pay a service fee equal to union dues. Some portions of this

service fee were then used to pay "for political and ideological purposes unrelated to collective bargaining." *Id.* at 232. The Court held that this program violated the principle that "the freedom of an individual to associate for the purpose of advancing beliefs and ideas" is protected by the First Amendment. *Id.* at 233. Although the union could compel objectors to provide funds for purposes that were "germane" to "its duties as [a] collective-bargaining representative," it would violate basic principles of freedom of association to compel the financial support of objectors for ideological purposes unrelated to collective bargaining. *Id.* at 235. The Court revisited similar issues in *Keller v. State Bar of California*, 496 U.S. 1 (1990), in which it invalidated a program in which mandatory dues to the California State Bar were used, over member's objections, to advance political and ideological causes to which some bar members did not subscribe. The Court held that the state bar could use compulsory membership dues to finance activities "germane" to the purposes for which the "compelled association and integrated bar [were] justified . . . the State's interest in regulating the legal profession and improving the quality of legal services." *Id.* at 13. It could not, however, order compulsory dues to be used to "fund activities of an ideological nature which fell outside of those areas of activity." *Id.* at 14.

*Abood* and *Keller* set forth the principles that were later applied — with differing results — in *Glickman v. Wileman Bros. & Elliot*, 521 U.S. 457 (1997), and in *United Foods* to programs in which the government compels agricultural producers to contribute to joint marketing programs. In *Glickman*, the Court rejected a First Amendment challenge to a regulatory program that required tree fruit growers to fund marketing campaigns as part of a broader regulation of the industry. The crucial distinction between *Glickman* and *United Foods* is that the mandatory assessment in *Glickman* was "ancillary to a more comprehensive program restricting market autonomy." *United Foods*, 533 U.S. at 411. We have explained the distinction between the two cases as follows: "If

the generic advertising assessment is part of a 'comprehensive program' that 'displace[s] many aspects of independent business activity,' exempts the firms within its scope from the antitrust laws, and makes them 'part of a broader collective enterprise,' the assessment does not violate the First Amendment." *Delano Farms v. Cal. Table Grape Comm'n*, 318 F.3d 895, 898-99 (9th Cir. 2003). The program in *United Foods*, on the other hand, raised a constitutional problem because "[i]f the program is, in the main, simply an assessment of independent and competing firms to pay for generic advertising, it does violate the First Amendment." *Id.* at 899. The *United Foods* rule protects against "making one entrepreneur finance advertising for the benefit of his competitors" when there is no broader regulatory interest at stake. 533 U.S. at 418 (Stevens, J., concurring).

Seen in this perspective, *United Foods* is a logical extension of a long line of cases that have protected both freedom of expression and freedom of association. *See United States v. Frame*, 885 F.2d 1119, 1132 (3d Cir. 1989) (describing the "underlying rationale of the right to be free from compelled speech or association" as guiding the *Abood* line of cases). Under *Wooley* and *Barnette*, the First Amendment does not permit the government to force citizens to express beliefs that are not their own. As an extension of this principle, under *Abood*, *Keller* and *United Foods*, the First Amendment also does not permit the government to force citizens to contribute to a private association when the funds are used primarily to support expression from a certain viewpoint.[5] The First

---

[5]Read in this context, it is clear that *United Foods* relied on harm to expressive and associational freedoms in order to support its conclusion. *See* 533 U.S. at 413 ("It is true that the party who protests the assessment here is required simply to support speech by others, not to utter the speech itself. We conclude, however, that the mandated support is contrary to the First Amendment principles *set forth in cases involving expression by groups which include persons who object to the speech, but who, nevertheless, must remain members of the group by law or necessity*.") (empha-

Amendment may, however, under *Abood* and *Glickman,* permit the government to compel contributions to an association's expression when that expression is germane to a broader regulatory scheme that compelled the association in the first place.[6]

[2] Nothing in *United Foods* suggests that the compelled speech doctrine applies to situations where the government imposes an excise tax on private citizens and then uses the money to speak in the name of the government itself. No court has held otherwise. *See NAACP v. Hunt*, 891 F.2d 1555, 1566 (11th Cir. 1990) ("*Abood* has never been applied to the government, however; if it were, taxation would become impossible."). An otherwise valid tax for an otherwise valid purpose ordinarily must bind even those who object to the government's objective. In *Board of Regents of the University of Wisconsin System v. Southworth*, 529 U.S. 217, 229 (2000), the Court explained that:

> It is inevitable that government will adopt and pursue programs and policies within its constitutional

---

sis added). The Court emphasized that contributions to the Mushroom Council forced certain private parties to pay for the speech of other private parties — a violation of both expressive and associative freedom. *Id.* at 416 (noting "the mandatory assessments imposed to require one group of private persons to pay for speech by others").

[6]Because *United Foods* is easily reconciled with previous Supreme Court precedent, we do not see a basis in *United Foods* for our dissenting colleague's view that, in distinguishing *Glickman*, the Court intended to untether the compelled speech doctrine from its expressive and associational moorings and create a new constitutional right to challenge all forms of targeted taxation. Nor does *United Foods* suggest that we should apply principles governing government suppression of private commercial speech, *see Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 564 (1980), to this case — in which the government has neither suppressed nor compelled speech, but has merely used an excise tax to fund a governmental message. Surely if the Court in *United Foods* had intended to create such broadly sweeping principles, it would have said so.

powers but which nevertheless are contrary to the profound beliefs and sincere convictions of some of its citizens. The government, as a general rule, may support valid programs and policies by taxes or other exactions binding on protesting parties. Within this broader principle it seems inevitable that funds raised by the government will be spent for speech and other expression to advocate and defend its own policies.

**[3]** Put simply, the rationale of the *Abood* and *Keller* line of cases — protecting freedom of expression and association — does not apply to government speech when the government acts as both a taxing authority and as a speaker. Paying a tax, even an excise tax, does not create a compelled form of association. When the government acts as a speaker it may espouse views that directly contradict those of taxpayers without interfering with taxpayers' freedom of expression. In a democracy based on majority rule, such a conclusion is inescapable. "Government officials are expected as a part of the democratic process to represent and to espouse the views of a majority of their constituents. . . . If every citizen were to have a right to insist that no one paid by public funds express a view with which he disagreed, debate over issues of great concern to the public would be limited to those in the private sector, and the process of government as we know it radically transformed." *Keller*, 496 U.S. at 12-13. As we have said before, "[s]imply because the government opens its mouth to speak does not give every outside individual or group a First Amendment right to play ventriloquist." *Downs v. Los Angeles Unified School Dist.*, 228 F.3d 1003, 1013 (9th Cir. 2000).

## B.  The California Regulation and Compelled Speech

The companies claim that their situation is unique because the DHS pays for its anti-industry ads exclusively from revenues raised ultimately through the surtax, which in turn is derived exclusively from sales of cigarette packages. They

argue that imposing an excise tax on a particular industry and then earmarking the use of the tax funds for advertisements that criticize that industry suffices to make the companies similarly situated to the plaintiffs in the compelled speech cases.

There is a fundamental difference between the excise tax/ spending regime at issue here and the compelled contributions to private associations that were at issue in *Abood*, *Keller* and *United Foods*. When a union, a state bar association or even a mushroom growers' association speaks, it represents only the interests of that particular entity. When California uses funds from the tobacco surtax to produce advertisements, it does so in the name of all of California's citizens. As the district court observed, "[The tobacco companies] are not seeking to prevent coerced participation in private association; rather, they are attempting to exercise a taxpayer's veto over speech by the government itself." *Bonta*, 272 F. Supp. 2d at 1100. That California has chosen to fund a valid public health message through a targeted excise tax does not mean that it is no longer speaking as the State of California.

The key issue is not the targeted nature of the tax but the degree of governmental control over the message. *See Livestock Mktg. Ass'n v. USDA*, 335 F.3d 711, 723 (8th Cir. 2003) (noting that "the greater the government's responsibility for, and control over, the speech in question, the greater the government's interest therein"). In the compelled speech cases cited by the companies, control over the content of the message produced had been delegated to an association "representative only of one segment of the population, with certain common interests." *Abood*, 431 U.S. at 259 n.13 (Powell, J., concurring). The problem with the government forcing private citizens to contribute funds in those cases was that the funds were being used to support the speech of such segmented, specific interests. Here there can be no doubt that the tobacco companies' funds are being used to speak on behalf of the people of California as a whole. Any coercion — that is, the

collection of funds used to produce a particular message — is performed not in the name of a segment of the public, but of the state.

Indeed, a wide range of First Amendment cases differentiate between the government controlling the expenditure of its own revenue and the government sharing control with private or quasi-private parties. *See, e.g.*, *Rust v. Sullivan*, 500 U.S. 173, 197 (1991) (distinguishing situations where the government imposes a direct constraint on the use of its own money from situations "in which the Government has placed a condition on the *recipient* of the subsidy rather than on a particular program or service, thus effectively prohibiting the recipient from engaging in the protected conduct outside the scope of the federally funded program"); *FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 399-400 (1984) (same); *Widmar v. Vincent*, 454 U.S. 263, 268 (1981) (establishing limited public forum doctrine and explaining that the First Amendment "forbids a State to enforce certain exclusions from a forum generally open to the public, even if it was not required to create the forum in the first place").

This is not to say that a state may avoid the limits of the First Amendment simply by labeling a compelled contribution a contribution to the government's own speech. As the Supreme Court has noted, a state law "determination that [an entity] is a 'government agency,' and therefore entitled to the treatment accorded a governor, a mayor, or a state tax commission, for instance, is not binding on us when such a determination is essential to the decision of a federal question." *Keller*, 496 U.S. at 11. The analysis may differ when the government nominally controls the production of advertisements, but as a practical matter has delegated control over the speech to a particular group that represents only one segment of the population. *See Frame*, 885 F.2d at 1133-34 (describing compelled contributions to a nominally government controlled "Cattleman's Board," where the persons with actual control over the disbursement of funds were private individuals

"whose primary or overriding purpose is to promote the welfare of the cattle producers" (quoting 7 U.S.C. § 2905(b)(4))); *see also Mich. Pork Producers Ass'n v. Veneman*, 348 F.3d 157, 161 (6th Cir. 2003) ("We conclude that the pork industry's extensive control over the Pork Act's promotional activities prevents their attribution to the government.").[7] But that situation is not present here. As the district court put it, "[w]hile in some cases the distinction between government speech and compelled allegiance may present 'difficult issues,' the analysis here is straightforward." *Bonta*, 272 F. Supp. 2d at 1100 (quoting *United Foods*, 533 U.S. at 417).

[4] In their complaint, the tobacco companies themselves allege that the director of the DHS, a government agency, is "ultimately responsible for the advertising challenged in this action." The DHS is acting expressly according to California law, which directs the DHS to implement a media campaign emphasizing "both preventing the initiation of tobacco use and quitting smoking . . . based on professional market research and surveys necessary to determine the most effective method of diminishing tobacco use among specified target populations." Cal. Health & Safety Code § 104375(e)(1).

---

[7]Thus, the dissent's claim that there is an "untenable distinction" between situations in which the government speaks for itself and situations where the government has effectively licensed control over speech to a private organization is misplaced. In similar cases, courts can (and often have) examined whether or not the government has delegated authority to a private body, such that a compelled subsidy is being used to support a private interest instead of a governmental one. *See, e.g.*, *Cochran v. Veneman*, 359 F.3d 263, 278 (3d. Cir. 2003) (finding First Amendment concerns where an agricultural act "seem[ed] to really be special interest legislation on behalf of the industry's interest more . . . than the government's"). Indeed, this was what was at issue in the language the dissent quotes from the Third Circuit's decision in *Frame*; that court identified an improper "coerced nexus between the individual and . . . specific expressive activity" in a case where "the Cattlemen's Board seems to be an entity 'representative of one segment of the population, with certain common interests.' " *Frame*, 885 F.2d at 1132, 1133 (citing *Abood*, 431 U.S. at 259 n.13 (Powell, J., concurring)).

The advertisements are also clearly identified as coming from the government itself and not from the tobacco companies, the tobacco industry or any other private party or group. *Cf. Frame*, 885 F.2d at 1133 n.11 (describing advertisements "without mention of the Secretary or the Department of Agriculture, thus failing to communicate that the advertisements are funded through a government program"). As noted above, all the contested advertisements expressly state that they are sponsored by the DHS. Plainly, in imposing the surtax and in producing the contested advertisements, California is acting on behalf of all of its citizens.[8]

---

[8]As a point of comparison, it is worth citing those aspects of the organization of the State Bar of California upon which the Supreme Court relied to hold that its speech should not be classified as coming from the government itself:

> The State Bar of California is a good deal different from most other entities that would be regarded in common parlance as "governmental agencies." Its principal funding comes, not from appropriations made to it by the legislature, but from dues levied on its members by the board of governors. Only lawyers admitted to practice in the State of California are members of the State Bar, and all 122,000 lawyers admitted to practice in the State must be members. [The State Bar] undoubtedly performs important and valuable services for the State by way of governance of the profession, but those services are essentially advisory in nature. The State Bar does not admit anyone to the practice of law, it does not finally disbar or suspend anyone, and it does not ultimately establish ethical codes of conduct. All of those functions are reserved by California law to the State Supreme Court. . . . The State Bar of California was created, not to participate in the general government of the State, but to provide specialized professional advice to those with the ultimate responsibility of governing the legal profession. Its members and officers are such not because they are citizens or voters, but because they are lawyers. We think that these differences between the State Bar, on the one hand, and traditional government agencies and officials, on the other hand, render unavailing [the State Bar's] argument that it is not subject to the same constitutional rule with respect to the use of compulsory dues as are labor unions representing public and private employees.

*Keller*, 496 U.S. at 11, 13 (footnotes and citations omitted). Here, by contrast, the contested advertisements are unquestionably part of the "general government of the state."

## C.   Excise Taxation, Government Speech and the First Amendment

In short, by being required to contribute to the DHS's advertisements, the tobacco companies have not been deprived of their freedom of expression or their freedom of association, which are the harms that the compelled speech cases protect against. The tobacco companies' claim goes to another kind of harm — the harm caused by paying an excise tax used to fund government speech of which they understandably disapprove.

The tobacco companies concede that the state would not have violated the First Amendment had it imposed the same surtax on cigarette packs, commingled the proceeds of the surtax with the state's general fund and then used the general fund to produce precisely the same advertisements. Thus, the tobacco companies object only to the nexus between the excise tax and the advertisements. Federal courts have traditionally given great deference to a state's control over its financial affairs when faced with constitutional challenges. *See, e.g.*, *San Antonio Independent Sch. Dist. v. Rodriguez*, 411 U.S. 1, 40 (1973) (noting, in a challenge under the Equal Protection Clause, that "[t]his Court has often admonished against such interferences with the State's fiscal policies"); *see also Welsh v. Likins*, 550 F.2d 1122, 1131-32 (8th Cir. 1977) ("No right of a state is entitled to greater respect by the federal courts than the state's right to determine how revenues should be raised and how and for what purposes public funds should be expended."). The Supreme Court has repeatedly emphasized that deference not warranted in other regulatory areas is warranted when it comes to the tax system. *Regan v. Taxation With Representation of Wash.*, 461 U.S. 540, 547-548 (1983) ("Legislatures have especially broad latitude in creating classifications and distinctions in tax statutes. . . . '[I]n taxation, even more than in other fields, legislatures possess the greatest freedom in classification.'" (quoting *Madden v. Kentucky*, 309 U.S. 83, 87-88 (1940))). The tobacco

companies can point to no case in which, when the state has the right both to impose the relevant tax and to promulgate the relevant speech, the First Amendment mandates that a state arrange its budgetary categories so as to make the link between a tax and speech less direct.

The implication of the tobacco companies' argument is that industries subject to an excise tax are entitled to a special veto over government speech funded by the tax. Such a right, in turn, would suggest that excise taxes, especially those that earmark funds for particular purposes, are so unusual or improper that they should allow payors of those taxes to avoid the political process and use the courts to control government speech. This suggestion fundamentally misunderstands the history of taxation in the United States, because excise taxation targeted at particular goods or industries is not only common but predates the income tax. *See* U.S. CONST. art. I, § 8, cl. 1 ("The Congress shall have Power To lay and collect Taxes, Duties, Imposts and *Excises*") (emphasis added); THE FEDERALIST NO. 12 (Alexander Hamilton) ("[I]n America, far the greatest part of the national revenue is derived from taxes of the indirect kind, from imposts, and from excises."). One of the earliest Supreme Court cases upheld a uniform national excise tax on carriages. *Hylton v. United States*, 3 U.S. (3 Dall.) 171 (1796). And excise taxes are hardly unusual today. According to the Office of Management and Budget, the federal government collected approximately 67 billion dollars in excise taxes in 2002. *See* Office of Management and Budget, *Budget for Fiscal Year 2004, Summary Tables,* at *http:// www.whitehouse.gov/omb/budget/fy2004/summarytables.html* (last visited Aug. 23, 2004).

**[5]** Nor is it a novel feature of American government to levy an excise tax on a particular industry and then use the proceeds of that tax in ways that regulate that industry. The nineteenth century Supreme Court upheld (albeit not against a First Amendment challenge) a federal tax statute that required distillers of alcohol to both pay an excise tax and pay

the salaries of federal officers supervising the production of alcohol. *United States v. Singer*, 82 U.S. (15 Wall.) 111, 118-19, 122 (1872) (upholding an act requiring distillers to " 're-imburse to the United States the expenses and salary of all storekeepers or other officers in charge of . . . warehouses' "). Excise taxes levied in the name of public health have long been held constitutionally permissible, even when such taxation has put severe burdens on particular industries. *See McCray v. United States*, 195 U.S. 27, 63 (1904) (upholding, as an exercise of Congress's ability to protect public health, the constitutionality of an excise tax on artificially colored oleomargarine "although it be true that the effect of the tax in question is to repress the manufacture of artificially colored oleomargarine"); *Patton v. Brady*, 184 U.S. 608, 623 (1902) (upholding an excise tax on tobacco and noting that "it is no part of the function of a court to inquire into the reasonableness of the excise either as respects the amount or the property upon which it is imposed").

Today, a tax on heavy trucks and trailers is dedicated to a fund intended to improve highways. *See* 26 U.S.C. § 9503 (establishing a "Highway Trust Fund"); 26 U.S.C. § 4051 (imposing a retail tax on heavy trucks and trailers dedicated to the Highway Trust Fund). A tax on fishing equipment is dedicated to government action to preserve fisheries. *See* 26 U.S.C. § 9504(a) (establishing an "Aquatic Resources Trust Fund"); 26 U.S.C. § 4161 (imposing an excise tax on sport fishing equipment dedicated to the Aquatic Resources Trust Fund). Yet we would not conclude that the manufacturers of large trucks have a First Amendment right to veto government speech on highway safety, or that the makers of sonar fish finders have a First Amendment right to direct government speech on fishery management.

**[6]** There is thus a long history of excise taxation directed at particular industries in the name of public health and welfare. Despite this history, not one court has upheld a right of an industry to block otherwise legitimate government activity

simply because the industry pays an excise tax. The tobacco companies offer no reason why they should be entitled to such unique treatment here.

Significantly, the tobacco companies have not offered any principle that could limit the consequences of sustaining their objection. Although the companies claim that they object only to the denigratory advertisements at issue here, they offer no principled basis for limiting their "nexus" theory to such advertisements alone. For example, the tobacco companies do not explain why, if their First Amendment rights have been violated solely because of a nexus between the surtax and the challenged advertisements, they would not also have a right to challenge the use of surtax funds for anti-tobacco education in the public schools to the extent that they disagreed with the state's educational message.

**[7]** Thus, if the tobacco companies were permitted to object to government speech simply because they pay an excise tax used to fund speech contrary to their interests, the result could be not only to reduce government's ability to disseminate ideas but also an explosion of litigation that could allow private interests to control public messages. There are numerous taxpayers who contribute disproportionately through excise taxes to government speech with which they disagree. If each were to have a similar right to challenge what it may deem government "propaganda," the government's ability to perform crucial educational and public health activities in the interests of all citizens would be hampered. *Cf. Downs*, 228 F.3d at 1015 (noting that if a First Amendment violation applied to government speech, "[the plaintiff] would be able to do to the government what the government could not do to [the plaintiff]: compel it to embrace a viewpoint.")

### D.  Other Limitations on Government Speech and the Power to Tax

At the risk of repetition, we emphasize that the tobacco companies do not argue that the government's speech itself is

constitutionally impermissible; nor do they argue that the government has burdened their First Amendment rights through the exercise of its power to tax. Were the tobacco companies challenging a California restriction on their ability to express their views, our analysis would be different. As the district court noted, there are already several recognized instances of constitutional limitations on government speech and "government is no more free to disregard constitutional and other legal norms when it speaks than when it acts." *Bonta*, 272 F. Supp. 2d at 1110. For example, there may be instances in which the government speaks in such a way as to make private speech difficult or impossible, or to interfere with some other constitutional right, which could raise First Amendment concerns. *See Warner Cable Communications, Inc. v. City of Niceville*, 911 F.2d 634, 638 (11th Cir. 1990) ("[T]he government may not speak so loudly as to make it impossible for other speakers to be heard by their audience. The government would then be preventing the speakers' access to that audience, and first amendment concerns would arise.").

Another limitation on government speech is found in the Establishment Clause. *See Bd. of Educ. of Westside Cmty. Schs. v. Mergens*, 496 U.S. 226, 250 (1990) ("[T]here is a crucial difference between *government* speech endorsing religion, which the Establishment Clause forbids, and *private* speech endorsing religion, which the Free Speech and Free Exercise Clauses protect.") (emphasis in original). The dissent, quoting a passage often used by the tobacco companies in this litigation, invokes Thomas Jefferson's pronouncement that "to compel a man to furnish contributions of money for the propagation of opinions which he disbelieves, is sinful and tyrannical." P. Kurland & R. Lerner, eds., 5 THE FOUNDERS' CONSTITUTION 77 (1987). As the district court carefully explained,

> The quoted statement is taken from Jefferson's Virginia Bill for Establishing Religious Freedom, a landmark anti-establishment measure declaring that

> 'no man shall be compelled to frequent or support any religious worship, place, or ministry whatsoever.' *Id.* It is perhaps significant that the statement arose in this context, since 'the Establishment Clause is a specific prohibition on forms of state intervention in religious affairs with no precise counterpart in the speech provisions.' *Lee v. Weisman*, 505 U.S. 577 (1992).

*Bonta*, 272 F. Supp. 2d at 1107 n.25. Jefferson's comment was directed to a situation in which the government speech itself was improper, not to valid taxation used to fund valid governmental speech.

There are also strict limits on the government's ability to impose taxes that are "general law[s] singling out a disfavored group on the basis of speech content." *Rust*, 500 U.S. at 194; *see also Arkansas Writers' Project, Inc.*, 481 U.S. at 228-29.[9] A government tax designed to suppress the speech of a targeted group would raise serious First Amendment concerns.

**[8]** But these are issues not before us. On this record, we need not determine the metes and bounds of constitutionally permissible government speech; nor need we articulate abstract limits on the state's power to tax. We share our dis-

---

[9]Concerns about forced expression, repression of speech, improper taxation and interference with other constitutional rights could arise, for example, under the facts of *Summit Medical Center v. Riley*, 284 F. Supp. 2d 1350, 1353-54 (M.D. Ala. 2003), a case cited to us by the tobacco companies. In *Summit Medical*, it appears that the state of Alabama designed a program to suppress abortion clinics' ability to disseminate independent information, requiring the clinics to purchase from the state and then display information intended to dissuade women from obtaining abortions. The plaintiffs in *Summit Medical* challenged the burden this mandatory purchase-and-display program imposed upon their own expression, as well as its compulsory and discriminatory nature. *Id.* at 1354. We take no position on the correctness of the district court's decision in *Summit Medical*, but note that it confronted a factual situation very different from the one we consider here.

senting colleague's concern that the government not use its taxation power to suppress the free expression of disfavored groups, but the tobacco companies claim no suppression of ideas. The nexus between excise taxation and government speech is the only First Amendment argument they raise, and we limit ourselves to that issue alone. For the reasons set out above, we reject the companies' argument.

## II.   Seventh Amendment and Due Process Claims

The tobacco companies also raise a novel claim under the Seventh Amendment. They note that they face litigation in state and federal courts. They argue that because the advertisements publicly disparage the reputation and character of the tobacco industry, their right to receive a jury trial under the Seventh Amendment has been infringed because potential future jurors in potential future trials could be biased by the advertising. They do not, however, allege that any actual trial in which they have participated was rendered unconstitutionally unfair by the challenged advertisements.

There are a number of problems with this argument. The companies cite only to cases involving a criminal defendant's Sixth Amendment right to jury trial in criminal cases or to interpretations of the procedural rules governing the federal courts, and not to any case suggesting that they have an independent Seventh or Fourteenth Amendment right to be free of disparaging state speech before a civil trial. Moreover, as the district court noted, the Seventh Amendment's guarantee of the right to a civil trial by jury does not apply to the states and was not incorporated into the Fourteenth Amendment. *See Dohany v. Rogers*, 281 U.S. 363, 369 (1930); *Walker v. Sauvinet*, 92 U.S. 90, 92 (1875). Therefore, whether parties may raise claims against state officials under 42 U.S.C. § 1983 for Seventh Amendment violations is questionable.

**[9]** We need not consider these issues, however. Even assuming that the tobacco companies may properly allege a

violation of Seventh or Fourteenth Amendment rights due to juror bias created by these advertisements, the proper context for raising such issues is an actual jury trial where a court could consider whether real jurors actually have been biased. Allegations of juror bias are traditionally resolved by the court conducting the trial, not courts considering hypothetical future proceedings. *See Smith v. Phillips*, 455 U.S. 209, 217 (1982) ("Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen. Such determinations may properly be made at a hearing [conducted by the trial court]."). None of the cases cited by the companies supports their asserted right to be free from negative publicity because *potential* jurors may be prejudiced in potential cases, and we are aware of no case that supports their claim that this court should enjoin certain speech in order to protect the alleged injury occurring in *another* court.

The tobacco companies do not allege the elements of stigmatization that would violate their due process rights. *Cf. Wisconsin v. Constantineau*, 400 U.S. 433, 436 (1971) (establishing that stigma can change a person's legal status and therefore constitute a violation of due process). The companies cannot meet the requirements of the "stigma-plus" test established in *Paul v. Davis*, where the Supreme Court explained that in addition to reputational harm, a due process stigma claim must assert that a recognized liberty or property right, as secured by the due process clauses, has been violated. 424 U.S. 693, 701 (1976); *see also WMX Tech., Inc. v. Miller*, 197 F.3d 367, 374 (9th Cir. 1999) ("[R]eputation, without more, is not a protected constitutional interest."). The companies assert that the alleged deprivation of their right to a fair jury trial is sufficient to meet the stigma-plus test. In essence, the companies are trying to bootstrap two arguments about reputational harm to create a single claim — arguing that the reputational harm creates juror bias, and that the juror bias combined with reputational harm creates a constitution-

ally improper stigma. We reject such an attempt at bootstrapping. *See Paul*, 424 U.S. at 712 ("[P]etitioners' defamatory publications, however seriously they may have harmed respondent's reputation, did not deprive him of any 'liberty' or 'property' interests protected by the Due Process Clause.").

## CONCLUSION

**[10]** For the reasons set forth above, we affirm the judgment of the district court.

## POSTSCRIPT

After we filed our opinion, the Supreme Court decided *Johanns v. Livestock Marketing Ass'n*, 125 S. Ct. 2055 (2005), holding that the Beef Promotion and Research Act of 1985 did not violate the First Amendment by imposing an assessment on all sales and importation of cattle to fund beef promotional campaigns with which many of the assessed parties disagreed. The Court reasoned, as we do here, that the Act was not susceptible to a First Amendment compelled-subsidy challenge because the assessments funded government speech. Although the *Johanns* opinion affirms our reasoning, Judge Trott remains in dissent. He would now remand to the district court pursuant to the Court's statement in *Johanns* that an as-applied challenge might lie "if it were established . . . that individual beef advertisements were attributed to respondents." *Id.* at 2065.

Appellants have never, before us or the district court, claimed that the ads at issue in this litigation could be or were attributed to them; nor does the record reveal a material question of fact on the issue. A reasonable viewer could not believe that these anti-industry ads, expressly identified as "Sponsored by the California Department of Health Services," were created, produced or approved by the appellants. The ad singled out by the dissent as "put[ting] [words] directly into the mouth of the tobacco industry," for example, is unmistak-

able satire. In that ad, children play in a schoolyard while cigarettes fall like rain from the sky and a voiceover states "[w]e have to sell cigarettes to your kids. We need half a million new smokers a year . . . so we advertise near schools, at candy counters." No reasonable viewer could overlook the satirical tenor of this ad and attribute the voiceover text to actual tobacco executives.

We also find inapposite the dissent's analogy to our recent order in Charter v. United States Department of Agriculture, 412 F.3d 1017 (9th Cir. 2005). We remanded on the question of attribution in that case because the record indicated that the National Cattlemen's Beef Association "routinely, before Congress, and in other public ways and in press announcements, states that it is the trade organization and marketing organization of America's one million cattle producers." *Id.* at 1019. The record in this case contains no evidence that the state ever attributed its ads to the appellants or that a reasonable viewer could have done so; accordingly, we reject the analogy to *Charter* and decline Judge Trott's invitation to remand.

**AFFIRMED.**

TROTT, Circuit Judge, Dissenting:

> To compel a man to furnish contributions of money
> for the propagation of opinions which he disbelieves
> is sinful and tyrannical.[1]

Thomas Jefferson

The atmospheric challenge in this case, which is one we often face, is to focus not on the overwhelming demerits of the underlying subject matter — smoking — but on the primary constitutional principle at issue: whether consistent with the First Amendment's right against government abridgement of freedom of speech — which includes "the right to refrain from speaking at all"[2] — a state can compel reluctant individuals and private entities directly and exclusively to pay for and to support a public interest message with which the entities disagree and which subjects them public scorn, obloquy, and even hatred. It would be a mistake in this principled context to become overly distracted by the medical, physical, personal, financial, and addictive havoc knowingly inflicted for profit upon the public by the tobacco industry; or to be influenced by the hundreds of thousands of premature, preventable, and horrible smoking deaths caused by cancer, emphysema, heart and lung disease, and stroke. There is little doubt that government, in its role as steward of the public's general welfare, can mount a vigorous public campaign against smoking and the tobacco industry, and that it can do so with *general* tax revenues and by way of "government speech;" but can government do so using this particular compulsory funding mechanism? Today the target of government dislike is smoking, but tomorrow it will be something else, such as Alabama's imposition, in its the Woman's Right to Know Act, of a fee applied to abortion providers for the pro-

---

[1] *See, e.g.*, *Abood v. Detroit Bd. of Education*, 431 U.S. 209, 235 n. 31 (1977).

[2] *Wooley v. Maynard*, 430 U.S. 705, 714 (1977).

duction by the state of pro-childbirth materials which the providers did not wish to endorse, much less purchase. *See* Ala. Code §§ 26-23A - 1 to 13; *Summit Medical Center of Alabama, Inc. v. Riley*, 284 F.Supp.2d 1350 (M.D. Alabama 2003). Who knows whose disfavored ox or whose industry or business or lifestyle will be the next to be fatally gored in this manner by a well-intentioned government.

Moreover, hanging over this controversy like a blinking yellow light in the constitutional sky is Chief Justice Marshall's timeless admonition in *McCulloch v. Maryland*, 4 Wheat. 316, 4 L.Ed. 579 (1819), that "the power to tax is the power to destroy." This warning is not only memorable, but it reminds us that might, especially in the hands of government, does not always make right.

There appears no doubt that California's goal is to destroy the industry singled out for this targeted and exclusive tax. Although an earnest deputy attorney general denied this lethal purpose during oral argument, claiming that the Act's only purpose was to inform the public, her boss, the Attorney General of California William Lockyer, forthrightly said differently after the hearing. Attorney General Lockyer, who took the unusual step of attending the argument himself, is quoted by the Los Angeles Daily Journal as calling the tobacco companies "merchants of death" and agreed that the ad campaign aimed to put them out of business. He added that "the democratic process will provide a check on the use of taxes to fund such messages. Elected officials are responsible for appropriating the money . . . . If voters don't like the message, they can oust the messenger."[3] Query.

So this is the issue: can government, consistent with the First Amendment's right against the abridgment of free speech, create a public information program against an indus-

---

[3]*Los Angeles Daily Journal*, Tuesday, May 11, 2004, "Court revisits anti-smoking ad campaign."

try funded by a targeted excise tax imposed solely upon that industry and which is segregated in a special state health education account? Not surprisingly, in our system which values not just good goals but also the right process, the question here is not ends, but means.

## *DISCUSSION*

## First Amendment Claim

1. *Government and Compelled Speech*

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech . . . ." U.S. Const. amend. I. It is axiomatic that "[j]ust as the First Amendment may prevent the government from prohibiting speech, the Amendment may prevent the government from compelling individuals to express certain views . . . or from compelling certain individuals to pay subsidies for speech to which they object."[4] *United States v. United Foods*, 533 U.S. 405, 410 (2003). In *United Foods*, the latest in a series of compelled assessments cases, the Supreme Court held that government's forced assessments of mushroom producers, which funded advertisements promoting mushroom sales, violated the First Amendment. Relying primarily upon *United Foods*, appellants assert that California's targeted tax, which funds anti-industry advertisements, violates their right against compelled financing of speech.

By labeling the anti-tobacco advertisements "government speech," the majority concludes that the targeted tax is clear

---

[4]*W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943) provides an often quoted passage regarding the extension of free speech protections to those who wish not to speak: "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *Id.* at 642.

of First Amendment concerns. I respectfully disagree. Though the Supreme Court has embraced the existence of a "government speech" doctrine in this general context, *United Foods*, 533 U.S. at 417, the Court has not provided a clear explanation of the reach or proper application of the doctrine. The appellants assert that the central question is the source of the funding for the particular speech, contending that a targeted tax on a particular group to fund speech opposed to by that group constitutes unconstitutional compelled speech. Ultimately, the State's argument that the First Amendment's protections against compelled speech can be avoided by finding that the speech is spoken by the government is at odds with the force and logic of controlling authority.

## 2.  *Government Speech*

Focusing on the Supreme Court's brief reference to the government speech inquiry in *United Foods*, and the Court's discussion of government speech in other contexts, *see, e.g.*, *Lebron v. National Railroad Passenger Corp.*, 513 U.S. 374 (1995), the State asserts that the government is free from First Amendment concerns "when the state is the speaker." *Rosenberger v. Rector & Visitors of the Univ. of Virginia*, 515 U.S. 819, 833 (1995).[5] Specifically, the State asserts that because the speech at issue is not explicitly attributed to appellants, the free speech concerns of traditional compelled speech cases, *see, e.g.*, *Wooley*, 430 U.S. 705, are absent. Moreover,

---

[5]I note that the State also supports its position with general pronouncements made by the Court in its compelled assessments of speech cases indicating that the proper functioning of government requires the government to have control over the nature and content of its speech. *See, e.g.*, *Keller v. State Bar of California*, 496 U.S. 1, 12-13 (1990) ("Government officials are expected as part of the democratic process to represent and espouse the views of a majority of their constituents. . . . If every citizen were to have a right to insist that no one paid by public funds to express a view with which he disagreed, debate over issues of great concern to the public would be limited to those in the private sector, and the process of government as we know it would be radically transformed.")

the state asserts that the source of the State's funding for its speech is irrelevant to the question of the constitutionality of the particular speech.

The State's arguments, however, are not consistent with the trajectory and force of the Supreme Court's recent compelled speech jurisprudence. Specifically, the State's framework ignores the central lesson of *United Foods*: in that case, the Supreme Court reigned in its previous pronouncements in *Glickman v. Wileman Bros. & Elliott*, 521 U.S. 457, 476 (1997) that coerced government speech is akin to economic regulation and not entitled to First Amendment protection. *See Glickman*, 521 U.S. at 476. Instead, the *United Foods* Court propounded a broad constitutional protection against compelled contributions for commercial speech. *See United Foods*, 533 U.S. at 414. Indeed, applying *United Foods*, one court has held that the issue of government speech, which generally involves the state's power to control the *content* of its speech, is fundamentally different from the "government's authority to compel [plaintiffs] to support speech with which they personally disagree; such compulsion is a form of 'government interference with private speech.' " *Livestock Marketing Ass. v. USDA*, 335 F.3d 711, 720 (8th Cir. 2003) (holding compelled contributions in beef promotion violated First Amendment) (certiorari granted in part by *Veneman v. Livestock Marketing Ass'n*, 124 S.Ct. 2389 (U.S. May 24, 2004) and *Nebraska Cattlemen, Inc. v. Livestock Marketing Ass'n*, 124 S.Ct. 2390 (U.S. May 24, 2004). As Justice Thomas stressed in concurrence, "[a]ny regulation that compels the funding of advertising must be subjected to the most stringent First Amendment scrutiny." *United Foods*, 533 U.S. at 419 (Thomas, J., concurring). Finally, the State's argument necessarily relies on an untenable distinction between government speech activities paid directly from the government treasury, or coordinated by traditional government agencies, and those that are coordinated by more complex regulatory organizations and schemes, even when such schemes are funded and run by the government. As one commentator has noted,

"[g]overnment speech cannot logically be made a function of the office of the person making the allocation decision. That approach would elevate form over substance and would enable the government to dictate the First Amendment result simply by manipulating the agency in the decision-making process." Randall P. Bezanson & William G. Buss, *The Many Faces of Government Speech*, 86 Iowa L. Rev. 1377, 1430 (2001).

Accordingly, recognizing the principle expressed in *United Foods*, the appellants clearly have a First Amendment interest at stake that is not erased by pigeonholing the ads as "government speech." The question remains, however, whether the compelled speech does indeed violate appellants' free speech rights, an analysis that is governed by the Supreme Court's compelled speech line of cases, including *Abood*, *Keller*, *Glickman*, and *United Foods*.

### 3.    *Compelled Speech*

Appellants rely on the string of cases, beginning with *Abood*, concerning compelled contributions to speech, and assert that there exists the fundamental principle that, under the First Amendment, a discrete group should not be specifically taxed to fund speech with which they disagree. Indeed, this proffered principle provides a coherent picture of the puzzle with which courts have been struggling. *See, e.g.*, *Summit v. Medical Ctr. of Al. v. Riley*, 284 F.Supp.2d 1350, 1360 (holding that state's imposition of "a *direct* fee assessment on a limited class of citizens — abortion providers — and using the revenue to advance speech in support of the State's favored policy position on abortion" intruded on abortion provider's free speech rights) (emphasis added); *United States v. Frame*, 885 F.2d 1119 (3d Cir. 1989) ("[W]here the government requires a *publicly identifiable group* to contribute to a fund earmarked for the dissemination of a particular message *associated with that group*, the government has directly focused its coercive power for expressive purposes.") (citation

omitted) (emphasis added). The *United Foods* Court announced that the "question is whether the government may underwrite and sponsor speech with a certain viewpoint using *special subsidies* exacted from a designated class of person, some of whom object to the idea being advanced." *United Foods*, 533 U.S. at 410. And in *United Foods*, the Court answered: No. *Id.* at 411.

In answering the question, however, the Court was forced to distinguish another recent compelled speech case, *Glickman*, which was factually similar to *United Foods*, but where the Court had found that no First Amendment issues were raised by the forced subsidies. 521 U.S. at 460. In *Glickman*, the Court determined that "criticisms of generic advertising provide no basis for concluding that factually accurate advertising constitutes an abridgement of anybody's right to speak freely." *Id.* at 474. The *United Foods* Court distinguished *Glickman* by asserting that the program in *Glickman* "mandated assessments for speech [which] were ancillary to a more comprehensive program restricting marketing autonomy." *United Foods*, 533 U.S. at 411-12.

Thus, after distinguishing *Glickman*, and finding that First Amendment interests were at stake, the Court proceeded to apply the tenets established in *Abood* and *Keller*, which established the "germaneness test." *United Foods*, 533 U.S. 413. That test requires any coerced subsidized speech be germane to the larger purpose of the association at issue. *Abood*, 431 U.S. at 235 (holding that union can only finance speech not germane to collective bargaining with non-objecting members' funds); *Keller*, 496 U.S. at 13-14 (holding that state bar association can only compel payment for activities related to bar's purposes).[6]

---

[6]I note that the district court's decision relied on the question of association and stressed the non-associational nature of the tobacco industry being taxed, thereby distinguishing the *Abood* line of cases. Those cases stressed that there exists "a First Amendment interest in not being com-

Guided by *Glickman* and *United Foods*, and looking at the statutory scheme provided in the Act, it is clear that the tobacco companies are not similarly situated to the tree growers in *Glickman*, as they are not "bound together and required by statute to market their products according to cooperative rules" for purposes other than advertising or speech. *United Foods*, 533 U.S. at 412. Nor is the statutory scheme directly congruous with that in *United Foods*, as the ads in this case are a part of a larger regulatory scheme, and thus not clearly "a program where the principal object is speech itself." *Id.* at 415. Thus, the Act is different from both the statute analyzed in *United Foods* and the statute in *Glickman*. Moreover, the fact that the speech at issue involves, not the promotion of the relevant group's product, but the disparagement of the entire industry, only increases the difficulty of resolving this case.

Given the unique nature of the question presented, proper review of the Act must acknowledge *United Foods*'s obvious

pelled to contribute to an organization whose expressive activities conflict with one's 'freedom of belief.' " *Glickman*, 521 U.S. at 471 (quoting *Abood*, 431 U.S. at 235). The district court found that because the appellants subject to the surtax were not members of a particular association, their free speech rights were not undermined by any compelled financing of speech made on behalf of that association. This finding is also supported by some of the Court's language in *United Foods*, where it noted that there is "a threshold inquiry . . . whether there is some state imposed obligation which makes group membership less than voluntary; for it is only the overriding associational purpose which allows any compelled subsidy for speech in the first place." *United Foods*, 533 U.S. at 413. However, hinging the right to be free from compelled commercial speech on whether there is an associational interest at stake ignores the obvious fact of what the Court actually *did* in *United Foods*. Indeed, the Court not only found that the compelled subsidies constituted an unconstitutional infringement on the dissenting mushroom grower's speech rights, but it did so after expressly distinguishing *Glickman* on the grounds that there was no "regime of cooperation" as presented in *Glickman*. *Id.* at 415. Therefore, though the Court saves some of its associational rights rhetoric, the practical effect of its decision in *United Foods* is to unhinge its compelled speech analysis from the previously-pronounced requirement that there be an involuntary group membership.

retreat from *Glickman*, and the Court's pronouncement of broadened protection against compelled speech. In this regard, as the appellants assert, *United Foods* and the Court's previous compelled speech case law can be reconciled and understood by applying what *United Foods* explicitly stated: the First Amendment forbids certain compelled assessments from "a particular citizen, or a discrete group of citizens, to pay special subsidies for speech." 533 U.S. at 411.

As the Third Circuit recently explained, however, though a case may be properly characterized as a compelled speech case, "[t]he Supreme Court . . . has left unresolved the standard for determining the validity of laws compelling commercial speech . . . ." *Cochran v. Veneman*, 359 F.3d 263, 277 (3rd Cir. 2004). In *Cochran*, the court also explained that there are several standards available which the courts may try to apply: 1) the lenient standard derived from commercial speech cases, *see, e.g.*, *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 564 (1980), or some adaptation of that commercial speech standard, *see, e.g.*, *Livestock Marketing*, 335 F.3d at 722-23; 2) the "germaneness test" of traditional compelled speech cases, *see, e.g.*, *Abood*, 431 U.S. at 235-36, and 3) the stringent standard of associational cases, *see, e.g.*, *United States v. Frame*, 885 F.2d 1119 (3rd Cir. 1989).

The speech and the funding mechanism in this case is questionable under whatever standard one uses. In *Central Hudson*, the Court held that commercial speech is to be evaluated using intermediate scrutiny. That is, 1) the state must "assert a substantial government interest;" 2) "the regulatory technique must be in proportion to that interest;" and 3) the incursion on commercial speech "must be designed carefully to achieve the State's goal." 447 U.S. at 564. Under this standard, though never before applied to *compelled* commercial speech cases,[7] the speech regulation at issue, and the targeted

---

[7]I note, in this regard, that the Supreme Court in *United Foods* refused to apply the *Central Hudson* test because the "Government itself [did] not

tax placed on appellants, constitutes a disproportional and overly burdensome regulatory technique, thereby failing the second and third prongs of the *Central Hudson* test. Indeed, the speech in this case is exceptional in its difference from what the Court has previously encountered in its compelled commercial speech cases. Whereas previous cases generally involve promotional activity, *see, e.g.*, *Glickman*, 521 U.S. at 474; *United Foods*, 533 U.S. at 413-14, here, California is specifically targeting one discrete and largely disfavored group, forcing that group to meet the State's regulatory goals by directly financing speech designed to undermine that group's status and reputation. Though the State's goals may be strong and laudatory, the methods used seriously undermine the particular group's speech rights and seem disproportional to the goals to be achieved. Accordingly, the Act cannot survive *Central Hudson*'s intermediate scrutiny.

Moreover, as did the Sixth Circuit in *Michigan Pork Producers Ass'n, Inc. v. Veneman*, 348 F.3d 157 (6th Cir. 2003), I "find inapplicable to this case the relaxed scrutiny of commercial speech analysis . . . ." *Id.* at 163 (citing *Glickman*, 521 U.S. at 474 n.18 (questioning whether "the *Central Hudson* test, which involved commercial speech should govern a case involving the compelled funding of speech"). The speech in this case is materially different from the speech issuing from the private sector that we normally label as commercial.

Applying the "germaneness test" derived from *Abood* and its progeny, the compelled speech here would also fail. The Supreme Court expressly applied this test in *United Foods*, and found that "the expression respondent [was] required to

---

rely upon *Central Hudson* to challenge the Court of Appeals' decision." 533 U.S. at 410. Accordingly, other courts have recognized that the *Central Hudson* test has never been applied by the Supreme Court to compelled assessment of commercial speech cases. *See Cochran*, 359 F.3d at 277.

support [was] not germane to a purpose related to an association independent from the speech itself." *United Foods*, 533 U.S. at 415-16. Of course, as previously explained, there is no relevant association of tobacco companies for purposes of this analysis. As the Court stressed in *United Foods*, the question is not whether the State necessarily has a larger regulatory purpose justifying the speech, but whether there is a "cooperative marketing structure . . . to sustain an ancillary assessment" for speech. *Id.* Here, as in *United Foods*, there is no collective association to which the compelled assessments for speech is germane.

Finally, as in *Frame*, a pre-*Glickman* and pre-*United Foods* case, the Third Circuit applied the stringent associational rights standard of *Abood*, but upheld the constitutionality of the beef regulatory statute in question because of the compelling state interest involved. *Frame*, 885 F.2d at 1134. In refusing to extend *Frame*'s reach after *United Foods*, however, the same court held in *Cochran* that *United Foods* established that "promotional programs . . . seem really to be special interest legislation on behalf of the industry's interests more so than the government's[,]" and therefore constitute unconstitutional compelled speech for those dissenting from the promotions. 359 F.3d at 279.

What has survived from *Frame* is the principle that in the review of a compelled financing statute's intrusion into free speech rights, "it is relevant to consider 'the coerced nexus between the individual and the specific expressive activity.' " *Summit*, 284 F.Supp.2d at 1360 (quoting *Frame*, 885 F.2d at 1119). Here, the nexus is vital: unlike a situation in which money is allocated from the general treasury fund, individuals who have specifically been targeted by the speech are forced to pay for the speech. *See id.*

### 4. *Conclusion*

In sum, review under any of the available standards reveals that the compelled assessments in this case constitute an

exceptional case of government intrusion on the right not to be compelled to finance speech. Indeed, the Act is designed to force one particularly disfavored group to fund speech directly undermining that group's reputation. Such state action offends the very essence of the First Amendment. *See e.g.*, *Sons of Confederate Veterans v. Comm'r of the Va. Dept. of Motor Vehicles*, 305 F.3d 241, 242 (4th Cir. 2002) ("[T]he First Amendment was not written for the vast majority. . . . It belongs to the minority of one.") (Wilkinson, C.J., concurring in denial of rehearing en banc).

Moreover, the State can provide no limiting principle, no logical reason why, if the government is free to tax and speak in this manner against this group, it cannot do so against any other disfavored group or individual. *See Summit Medical Ctr. of Alabama*, 284 F.Supp.2d, at 1361 (refusing to apply the district court's analysis in this case, and finding that Alabama's statute forcing abortion providers to pay for the state's informational materials infringes plaintiffs' First Amendment rights). Contrary to the Attorney General's claim that the democratic process will provide a check on the use of taxes to fund such messages, by removing the burden of the cost of this program from every taxpayer except the ones targeted, this tax becomes the ultimate cheap shot, one not fully subject to the considerations that normally attend the decision to require the public at large to pay for something. *See Board of Regents v. Southworth*, 529 U.S. 217, 229 (2000) (traditional political controls ensure responsible government).[8] Furthermore, the approach I take does not hinder or unduly burden the State's right or power to speak, and it does not interfere with the imposition of excise or other taxes. It simply requires

---

[8]In *Michigan Pork Producers Ass'n v. Venenan*, 348 F.3d 157 (6th Cir. 2003), one significant factor in the court's determination that the speech involved was not government speech was that the funding did not come from general tax revenues. *Id.* at 162. *See also Livestock Marketing Ass'n*, 335 F. 3d at 720 (the flaw in the government speech argument is that the plaintiff's funds were identifiable as the funds used to finance the speech to which they objected).

the government when doing so to stay within normal channels and to avoid First Amendment violations. Under the reasoning and force of the Supreme Court's compelled speech cases, particularly the Court's recent pronouncements in *United* Foods, I respectfully believe the majority's argument, although well presented and articulated in their opinion, is without merit.

## POSTSCRIPT

Shortly after I circulated this dissent, the Supreme Court decided *Johanns v. Livestock Marketing Ass'n*, 544 U.S. \_\_\_\_\_, 125 S.Ct. 2055 (2005). For the majority of the Court, Justice Scalia wrote:

> The compelled-*subsidy* analysis is altogether unaffected by whether the funds for the promotions are raised by general taxes or through a targeted assessment. Citizens may challenge compelled support of private speech, but have no First Amendment right not to fund government speech. And that is no less true when the funding is achieved through targeted assessments devoted exclusively to the program to which the assessed citizens object. The *First Amendment* does not confer a right to pay one's taxes into the general fund, because the injury of compelled funding (as opposed to the injury of compelled speech) does not stem from the Government's mode of accounting.

*Id.* at _____ (second emphasis added) (citations omitted).

Not surprisingly, California's Attorney General suggests that this ruling "eliminates all possible doubt about the correctness" of the majority's decision. I do not agree.

The *Johanns* Court suggests, while "express[ing] no view on the point," that if it were to be shown that the challenged

speech would "convince *a reasonable factfinder*" that "all . . . producers[ ] would be tarred with the content of each trademarked ad," an "as applied" First Amendment challenge might lie. *Id.* at _____. (emphasis added).

Writing separately, Justice Thomas advanced the same suggestion:

> Still, if the advertisements associated their generic pro-beef message with either the individual or organization respondents, then respondents would have a valid as-applied *First Amendment* challenge. The government may not, consistent with the *First Amendment*, associate individuals or organizations involuntarily with speech by attributing an unwanted message to them, whether or not those individuals fund the speech, and whether or not the message is under the government's control. This principle follows not only from our cases establishing that the government may not compel individuals to convey messages with which they disagree, . . . but also from our expressive-associate cases, which prohibit the government from coercively associating individuals or groups with unwanted messages.

*Id.* at _____. (emphasis added) (citations omitted).

Here, one challenged government television ad — described by my colleagues as "particularly striking" — uses a voice-over technique to speak to the public on behalf of the tobacco industry. The words put directly into the mouths of the tobacco industry disparagingly associate the appellants and the industry with the unwanted message about which they now complain:

> *We* have to sell cigarettes to your kids. *We* need half a million new smokers a year just to stay in business so *we* advertise near schools, at candy counters. *We*

> lower our prices. *We* have to. It's nothing personal.
> You understand.

The "we" is the appellants.

If this language, albeit couched in a literary device, does not "tar all in the industry" required to pay for the ad, and if this language does not "coercively associate" and intentionally smear the appellants — all of them — with an "unwanted message" to which they object, it is hard to know what does. I respectfully disagree with the district court's preemption of this issue as a matter of law. The facts are such as to survive summary judgment and should be submitted — as suggested by the Supreme Court — to a factfinder.

At the very least, we should take our lead from our recent decision in *Charter v. United States Department of Agriculture*, _____ F.3d _____, _____ (9th Cir. 2005), recognizing the difference between that case and *Johanns* with respect to a possible attribution/association "as applied" challenge:

> In light of the Supreme Court's recognition [in *Johanns*] (without expressing a view on the issue) that an attribution claim might form the basis for an as-applied First Amendment challenge to the Act, the district court's decision must be vacated and the case remanded for further proceedings to determine, among other things, whether speech was attributed to appellants and, if so, whether such attribution can and does support a claim that the Act is unconstitutional as applied. *Id.*; *see also id.* at *9 n.* (Thomas, J., concurring) (noting that, pursuant to Federal Rule of Civil Procedure 15, "on remand respondents may be able to amend their complaint to assert an attribution claim").

There is a world of difference between what was at issue and at stake in *Johanns* and what is on our docket here. In

*Johanns*, the question was whether, consistent with the First Amendment, the government could compel beef producers to fund by way of mandatory assessments a generic advertising program promoting the sale of beef. 7 U.S.C. § 2901(b). In our case, however, the purpose of the coerced speech is deliberately destructive of those forced to pay for it — not so in *Johanns*. Does this difference matter here? I believe it does. The difference is not just one of degree, but of material kind. It is one thing to promote the sale of an agricultural product; it is altogether another to attempt to destroy an entire legal industry.

I see this case as distinguishable from *Johanns*, and I continue respectfully to dissent. In my view, we should remand to the district court for reconsideration on the "as applied" issue as newly articulated in *Johanns* itself.