**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

PARAMOUNT LAND COMPANY LP, a
California limited partnership;
PARAMOUNT ORCHARDS PARTNERS
VI LLC, a Delaware limited
liability company; WV
ACQUISITION CORPORATION, a
Delaware corporation; PARAMOUNT
FARMS INC.,
            *Plaintiffs-Appellees,*

                v.

CALIFORNIA PISTACHIO COMMISSION,
a California corporation,
            *Defendant-Appellant,*

                v.

WILLIAM H KIMBALL, an
individual; CENTRAL GREEN
COMPANY LP, a California limited
partnership; JACK BREWER, an
individual; YOSEMITE RETIREMENT
CAP GROWTH FUND; LOWE
PISTACHIO RANCH LLC, a
California limited liability
company; STEVE YOST, an
individual;

No. 06-55054

D.C. No.
CV-05-07156-
MMM

OPINION

John J Gudebski, an individual;
Erich Stegelmann, an individual;
James Nielsen, an individual;
Robert Manlove, an individual;
Haley Pistcachio Ranch; Dr.
Grace Blair, an individual; Kamm
South LLC, a limited liability
company; Reina Properties;
Samar Pistachio Ranch LP, a
California limited partnership;
Capri Pistachio Ranch LP, a
California limited partnership;
Palau Pistachio Ranch LP, a
California limited partnership;
Timor Pistachio Ranch LP, a
California limited liability
partnership; Gary Hageman, an
individual; Coulthard Ranch;
Floyd Harlan, an individual; Dr.
Kenneth D Hirsch, an individual;
Harlan Ranch Co; Budke Farms
Inc; Marvin R Yost, Trustee on
behalf of Marvin R Yost Trust;
Nagatani Farms LP, a limited
partnership; Amin Orchards Co;
Aldo Pistachio, Trustee on behalf
of Pistachio Lorraine Trust; DR.
M W Sulliyan, an individual;
Robert A Yost, an individual;
Moffett Creek Ranch
Partnership; Pendola Truckee
Venture; Santa Fe Orchards
Partnership; Sei-Saw Rancho;

JAMES BULLARD, an individual;
CATHERINE BULLARD, an individual;
MCDEVITT RANCH ETHEL KIMBALL,
an individual; FLORENCE THOM, an
individual; RON JUDSON, an
individual; BARBARA JUDSON, an
individual; VAN ALSBERG SPENCE;
BEATRICE REED, an individual;
SANDRA NIELSEN, an individual;
ROBERT MORRIS, an individual;
DAN EWELL, an individual; SHEILA
MARTIN, an individual; MADERA
PISTACHIO RANCH #2A; MADERA
PISTACHIO RANCH #2B; MADERA
PISTACHIO RANCH #2C; MADERA
PISTACHIO RANCH #3; MD CRAIG
CAMPBELL, an individual;
PROFESSIONAL FARMING CAPITAL
PISTACHIO GROVE; PETER J HINTON,
an individual; CITRUS RANCHES
LLP, a limited liability company;
LEE CRUMBLEY PISTACHIOS; FRANK J
BELLINO, an individual; MILTON
GREENSTEIN, an individual; HARRIET
CHAN-MEYERS, an individual and
as Administrator on behalf of
Kong Bypass Trust; FOREST V
YOUNG, an individual;

STEPHEN LEUNG, an individual; RV
DAIRY; MANNING AVE PISTACHIOS;
JEFF DICKEY, an individual; CLOYD
R CHAMBERLAIN, an individual;
JUDY L MUELLER, an individual;
THOMAS L GRIGGS, an individual;
MURRELL RANCH; KC FARMS INC.,
a corporation; KEITH HANSEN
RANCH; PLANADA LLC, a limited
liability company; FOWLER/PARLIER
FRAMS; HOWARD SILEN, an
individual; SHIRLEY CONAWAY, an
individual; ARTHUR IMIRIAN, an
individual; DONALD E BONANDER,
an individual; ROBERT LANE, an
individual; PRRISIO BROS; GLEN
KREIDER; an individual;
GURCHARIAN S SRA, an individual;
JOHNNY LAU, an individual; PAUL
GEORGE SOBAJE, an individual;
QUIST FRAMS; RICHARD C WYER, ;
DOUG CARMAN, an individual;
FIRST HARVEST PISTACHIO LP, a
limited partnership; GOLDEN
PISTACHIO GROVES LP, a limited
partnership; MADERA RANCH
COMPANY LP, a limited
partnership; SAN JOAQUIN GROVES;
MULTI CROP PARTNERS LP, a
limited partnership; SHARON
PISTACHIO FARMS II; SHARON
PISTACHIO PARTNERS III; DURHAM
GROWERS LP, a limited
partnership; BERENDA FARMS LP, a
limited partnership;

SIERRA VIEW PISTACHIO FARMS LP, a limited partnership; GARY BESS, an individual; MAIN RANCH LP, a limited partnership; EARMARK ENTERPRISE INC; ANNE M BUCK, an individual; JANET L SMITH, Trustee on behalf of the Smith Family Trust; RICHARD JOHNSON, an individual; CLYDE DAVIS, an individual; APACHE GROVE LAND PROGRAM 1970; APACHE GROVE LAND PROGRAM 1971; ERIK GIESE, an individual; TOM BALES, an individual; J ELLSWORTH OSBORNE, an individual; KOSAREFF FARMS; MD EUGENE F GULISH, an individual; HERBERT SINGER; APACHE GROVE LAND PROGRAM 1972; YOSEMITE RANCH; JOHN M KONG, an individual; SINGER PROPERTIES; MD ROBERT GWYAN, an individual; ALLEN F SCHWEICH, an individual; HAI-ROU CHU, an individual; CHUU-CHYAN CHU, an individual; JAY TAYLOR, an individual; ROBERT MONTGOMERY, Trustee on behalf of Robert L and Joan S Montgomery Family Trust; ROBERT MONTGOMERY, an individual; CONCENTRIC ENTERPRISE INC, a Nevada corporation; GARY STEIFAVTER, an individual; DON PARISIO, an individual; BARBARA PARISIO, in individual; AGGI OSCHIN, an individual;

DOWMAR FAMILY PARTNERSHIP; A
IAFRATI FARMS; ANTHONY IAFRATI,
an individual; GERARDO OROZCO,
an individual; ROBERTS RANCH; A
IAFRATI FARMS LP; GREGORY
WATTS, an individual; RORY
WATTS, an individual; PAUL M
WATTS, an individual; SNOWDEN
BOYLE JR., an individual; TED
BEAR, an individual; WAN HSI
PAN, an individual; J PATRICK
ROONEY, an individual; LASH
FARMS LLP, a limited liability
company,
  *Plaintiff-Intervenors-Appellees.*

‡

Appeal from the United States District Court
for the Central District of California
Margaret M. Morrow, District Judge, Presiding

Argued and Submitted
September 11, 2006—Pasadena, California

Filed June 8, 2007

Before: Cynthia Holcomb Hall, M. Margaret McKeown, and
Kim McLane Wardlaw, Circuit Judges.

Opinion by Judge McKeown

## COUNSEL

Seth P. Waxman, Randolph D. Moss, Neil J. King, and Todd Zubler, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, DC, and Jan L. Kahn, George Soares, Rissa A. Stuart, Kahn, Soares & Conway, LLP, Hanford, California, for Appellant.

Rex S. Heinke, Michael C. Small, and Edward P. Lazarus, Akin Gump Strauss Hauer & Feld LLP, Los Angeles, California, and Brian C. Leighton, Law Offices of Brain C. Leighton, Clovis, California, for appellees Paramount Land Company and affiliated entities.

Andrew S. Clare and Scott Lidman, Loeb and Loeb, L.L.P., Los Angeles, California, for appellees Madera Pistachio Ranch #2 and affiliated entities.

**OPINION**

McKEOWN, Circuit Judge:

In this appeal we consider whether a statutory scheme compelling California pistachio growers to fund generic advertising through the California Pistachio Commission ("Pistachio Commission") violates the First Amendment. More specifically, we address whether this generic advertising is "the Government's own speech and therefore is exempt from First Amendment scrutiny" under the Supreme Court's analysis in *Johanns v. Livestock Marketing Association*, 544 U.S. 550, 553 (2005).

A group of pistachio growers, Paramount Land Company, L.P., Paramount Orchards Partners VI LLC, WV Acquisition Corporation, and Paramount Farms, Inc., and intervenors William Koch and Donald Quist (collectively "Paramount"), challenge the marketing and promotional activities of the Pistachio Commission. Paramount argues that the annual subsidies mandated by the California Pistachio Act of 1980 (the "Pistachio Act"), Cal. Food. & Agric. Code §§ 69001-69114, and administered by the Pistachio Commission constitute compelled speech in violation of the First Amendment.

This issue arises in the context of the Pistachio Commission's appeal of a preliminary injunction forbidding it from collecting and using the challenged assessments until the litigation is resolved on the merits. Because it is not apparent on this record that Paramount can meet its burden to establish a First Amendment violation, Paramount has not demonstrated a likelihood of success on the merits. Although Paramount has raised the specter of irreparable injury by bringing a colorable First Amendment claim, its showing with respect to the merits is insufficient to sustain an injunction. We reverse the judgment of the district court and vacate the injunction.

**BACKGROUND**

## I. STATE REGULATION OF PISTACHIOS—THE PISTACHIO COMMISSION

The California state legislature created the Pistachio Commission "to enhance and preserve the economic interests of the State of California," by, among other activities, "[i]mplement[ing] public policy through [its] expressive conduct." Cal. Food & Agric. Code § 63901. The Pistachio Commission administers the Pistachio Act and supports the pistachio industry through advertising, marketing, research, and government relations campaigns. *See* Pistachio Act § 69051.

The Pistachio Commission is authorized to undertake a broad range of activity: (1) research into production, food safety, marketing, crop protection and production materials, (2) promotion of the elimination of trade barriers, (3) consumer education regarding the health benefits of pistachios, (4) demand-side regulation to stabilize the market, (5) analysis of relevant foreign, federal and state regulation, (6) cooperative crisis resolution, (7) cooperation with state and federal agencies in foreign negotiations, and (8) support of industry self-regulation. *See* Cal. Food & Agric. Code §§ 63901-63901.3. This regulatory scheme, which applies to all councils and commissions relating to agricultural or seafood markets in California, is designed to "work subject to, and together with, the constraints placed on the agricultural industry by state and federal statutes and regulations and international restrictions." *Id.* § 63901.4.

The Pistachio Commission has nine members, eight selected by California pistachio growers and one selected by the Secretary of the California Department of Food and Agriculture ("CDFA"). Pistachio Act § 69031. Acting through committees chaired by the commissioners, the Commission meets three times a year and employs a full-time staff to han-

dle daily operations. In addition to appointing one member of the committee, the Secretary of the CDFA (or a designee), may attend and participate in Pistachio Commission or committee meetings as an *ex officio* member. *Id.* Like other entities in the state government, the Commission is subject to transparency and ethics regulations designed to promote public accountability.

The Secretary retains broad statutory authority to: (1) review and approve the Pistachio Commission's annual budget and planned activities, (2) conduct fiscal and compliance audits, (3) approve nomination and election procedures, (4) decide appeals from grievance petitions filed by growers, and (5) suspend or discharge the Commission's president. *See id.* §§ 69051, 69069, 69092. The Secretary also may require the Pistachio Commission to "correct or cease any activity or function that is determined by the secretary not to be in the public interest or to be in violation of [the Pistachio Act]." *Id.* § 69032. Although the Secretary has ultimate authority over the Commission's budget, operations, and planning, the Secretary has declined to exercise many of his more specific statutory powers.

Paramount and its various affiliated entities are the largest producers of pistachios in California, together paying between 25 and 30 percent of the Pistachio Commission's total assessments in recent years. The expressive activity that has attracted Paramount's ire centers around generic print and public relations advertising campaigns for California pistachios. The most recent campaign features the logo "California Pistachios" and the slogan "Grab a Handful." The campaign included print advertising in magazines, media mailings, a satellite tour, talk-show appearances by spokesperson Jane Seymour, and promotion at the retail level (including point-of-sale promotional materials, price recommendations, and advertising incentives). Paramount maintains that these campaigns are "ineffective in augmenting pistachio sales," "do not adequately feature the nuts themselves," and are "antithet-

ical to Paramount's interests," which are to "increase sales by differentiating its products from competitor's products."

Paramount also targets the Pistachio Commission's government relations activities, which are coordinated by a political consultant who hires lawyers to represent the industry before the International Trade Commission and the Commerce Department, and to lobby government entities on behalf of the pistachio industry. Paramount complains that the Pistachio Commission has "not done enough to protect the domestic pistachio industry from foreign pistachios."

These offending activities are funded by mandatory assessments paid by pistachio producers and importers (via processors who deduct dues from the amount they pay the producers). *See id.* §§ 69081 & 69085. Failure to pay invites financial penalties and possible enforcement action by the Pistachio Commission. *Id.* §§ 69088-93. The majority of the Commission's annual budget, which has fluctuated between $6.6 million and almost $8 million in recent years, is dedicated to the challenged expressive activity.

## II. FEDERAL REGULATION OF PISTACHIOS

In 2004, the United States Secretary of Agriculture issued a marketing order for California pistachios under the Agricultural Marketing Agreement Act of 1937, 50 Stat. 246, as amended, 7 U.S.C. § 601 *et seq. See* 7 C.F.R. § 983 (the "Marketing Order"). The Marketing Order regulates two broad areas of the pistachio industry: aflatoxin levels and minimum quality levels. *Id.* § 983.38-39. The Marketing Order makes no mention of promotion, marketing, advertising, research, government relations or other potential expressive activity to be carried out by the administrative committee established by the federal regulations. The committee may "deliberate, consult, cooperate and exchange information with the California Pistachio Commission." 7 C.F.R. § 983.71.

### III.  PROCEEDINGS IN THE DISTRICT COURT

In October 2005, Paramount filed a complaint in the Central District of California against the Pistachio Commission, challenging the mandatory assessments under the First Amendment and on various state law grounds.[1] After Paramount moved for a preliminary injunction, 115 individual pistachio growers filed motions to intervene as plaintiffs and asked the district court to extend the preliminary injunctive relief to them. Although the parties stipulated to the interventions as to all but two of the growers, the district court denied the motions to extend relief. The vast majority of the growers were denied relief because they were generally unfamiliar with the Pistachio Commission's expressive activity and could not articulate any clear objections to that activity.

William Koch and Don Quist are the only intervenors whose motions were granted by the district court. Koch is a pistachio grower who objects to the Pistachio Commission's generic message that pistachios are "healthful" and believes the Pistachio Commission is no longer necessary. Quist, also a grower, objects to the Commission's marketing strategy, which emphasizes price rather than brand.

In December 2005, the district court granted Paramount's motion for a preliminary injunction.[2] The district court held that it was unlikely that the California state government exercised effective control over the Pistachio Commission for its expressive activity to qualify as "government speech" under *Johanns*. 544 U.S. at 560. It further held that under *Glickman v. Wileman Brothers & Elliot, Inc.*, 521 U.S. 457, 469-70 (1997), and *United States v. United Foods, Inc.*, 533 U.S. 405,

---

[1]Because the district court's preliminary injunction rested solely on First Amendment grounds, the First Amendment question is the only issue on appeal.

[2]Although we disagree with the district court's ultimate conclusion, we note its careful and extremely thorough treatment of the issues presented.

415 (2001), the assessments funded by the Pistachio Commission probably were not part of a larger economic regulatory scheme so as to make them constitutionally permissible under *Glickman*. As a result, the district court concluded that Paramount demonstrated a likelihood of success on the merits and that the potential loss of First Amendment freedoms constituted irreparable injury.

## ANALYSIS

We review for abuse of discretion the district court's grant of a preliminary injunction in favor of Paramount. *Harris v. Bd. of Supervisors*, 366 F.3d 754, 760 (9th Cir. 2004). In our review, we are mindful of the Supreme Court's dictate that this interlocutory posture "does not give the Court license to depart from established standards of appellate review." *Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656, 664 (2004) (citation omitted). Our review of underlying legal issues is *de novo*, and review of underlying fact findings is for clear error. *See Harris*, 366 F.3d at 760; *see also Lands Council v. Martin*, 479 F.3d 636, 643 (9th Cir. 2007) (as amended) (reversing a district court's failure to grant a preliminary injunction where the district court "made a clear error of law").

**[1]** In reviewing the injunction, we turn to the now-familiar Ninth Circuit standard: a preliminary injunction is warranted where plaintiffs demonstrate either (1) a likelihood of success on the merits and the possibility of irreparable injury; or (2) serious questions going to the merits and a balance of hardships strongly favoring the plaintiffs. *See Clear Channel Outdoor, Inc. v. City of Los Angeles*, 340 F.3d 810, 813 (9th Cir. 2003). "These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." *Prudential Real Estate Affiliates, Inc. v. PPR Realty, Inc.*, 204 F.3d 867, 874 (9th Cir. 2000). They are not separate tests but rather "outer reaches of a single continuum." *Los Angeles*

*Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1201 (9th Cir. 1980).

## I.  Likelihood of Success on the Merits

### A.  Johanns v. Livestock Marketing Association

**[2]** We approach Paramount's First Amendment claims with the benefit of the Supreme Court's recent guidance in *Johanns*, in which the Court framed "the dispositive question [as] whether the generic advertising at issue is the Government's own speech and therefore is exempt from First Amendment scrutiny." 544 U.S. at 553.

**[3]** *Johanns* held that, without more, the First Amendment is not implicated when the government requires private parties to subsidize government speech. *Id.* at 559-60. "The government, as a general rule, may support valid programs and policies by taxes or other exactions binding on protesting parties. Within this broader principle it seems inevitable that funds raised by the government will be spent for speech and other expression to advocate and defend its own policies." *Id.* at 559 (quoting *Bd. of Regents v. Southworth*, 529 U.S. 217, 229 (2000)). This "[c]ompelled support of government — even those programs of government one does not approve — is of course perfectly constitutional, as every taxpayer must attest." *Id.* (internal quotations omitted); *see also R.J. Reynolds Tobacco Co. v. Shewry*, 423 F.3d 906 (9th Cir. 2005) (holding that a promotional campaign designed by the California Department of Health Services and funded by an excise tax on tobacco companies was government speech immune to First Amendment challenges).

The Supreme Court then applied these principles to the Beef Promotion and Research Act of 1985 (the "Beef Act"), Pub. L. No. 99-198, 99 Stat. 1597 (1985), *see Johanns*, 544 U.S. at 553, 558-60. The Beef Act "announce[d] a federal policy of promoting the marketing and consumption of 'beef and

beef products,' using funds raised by an assessment on cattle sales and importation." *Id.* at 553. The statute itself directs the Secretary of Agriculture to implement this policy through a program that includes a Beef Board, appointed by the Secretary; an Operating Committee with equal representatives from the Beef Board members and state beef councils; and mandatory assessments to fund all projects designed by the Operating Committee and approved by the Secretary. *See id.* at 553-54.

**[4]** The Court held that the Beef Board's promotional activities constitute the "Government's own speech," and are thus unconstrained by the First Amendment.[3] *Id.* at 560-67. In concluding that the message of the promotional campaigns is "effectively controlled by the Federal Government," the Court emphasized three overlapping aspects of the program. *See id.* at 560-61. First, Congress directed the establishment of the program itself, including its promotional activities. *Id.* at 560-61. Second, through the statutory and regulatory scheme, Congress and the Secretary specify the general content of the promotional campaigns, such as requiring that the campaigns "shall . . . take into account" different types of beef products, and shall not refer to "a brand or trade name of any beef product" without prior approval. *Id.* at 561. Third, the record showed that the Secretary "exercises final approval authority over every word used in every promotional campaign." *Id.* at 563.

The Court also distinguished *Keller v. State Bar of California*, 496 U.S. 1 (1990), a challenge to the State Bar's use of mandatory dues for political and ideological campaigns. The key difference between the promotions under the Beef Act

---

[3]Although the majority opinion of the Court held that the challenged assessments were permissible as government speech, Justices Breyer and Ginsburg reasoned that these assessments are better analyzed as permissible economic regulation. *Johanns*, 544 U.S. at 569 (Breyer, J., concurring); *id.* (Ginsburg, J., concurring in the judgment).

and the speech at issue in *Keller* was that the "communicative activities" in *Keller* "were not prescribed by law in their general outline and not developed under official government supervision." *Johanns*, 544 U.S. at 562.

### B.  *Johanns* as Applied to the Pistachio Commission

The framework of statutes and regulations governing the Pistachio Commission and its activities essentially mirrors the scheme addressed in *Johanns*. Although the state of California may, in practice, exercise less oversight over the Pistachio Commission than the Secretary of Agriculture exercises over the Beef Board, on the record developed thus far, that distinction is not enough to differentiate the activities of the Pistachio Commission from those of the Beef Board.

[5] The structure of the Pistachio Commission and its relationship to the State of California is nearly identical in design to that of the Beef Board at issue in *Johanns*. The Pistachio Commission consists of nine members, of which eight are elected by industry members and one is appointed by the Secretary of the CDFA.[4] The Secretary must also concur in any nomination and election procedures adopted by the Pistachio Commission. Pistachio Act § 69069.

The Pistachio Commission is directed to "promote the sale of pistachios by advertising and other promotional means," *id.* § 69051(i), while the Beef Board is tasked with "carrying out a coordinated program of promotion and research designed to strengthen the beef industry's position in the marketplace and

---

[4]Paramount makes much of the fact that in *Johanns*, the entire Beef Board was "appointed" by the Secretary of Agriculture, but only one member of the Pistachio Commission is "appointed" by the Secretary of the CDFA. This distinction, while accurate, is somewhat exaggerated. The Beef Board is appointed by the Secretary of Agriculture from among a list of candidates nominated by the trade associations. 7 C.F.R. § 1260.141(b). Both boards are dominated by industry appointees, not independent third party board members.

to maintain and expand domestic and foreign markets and uses for beef and beef products." 7 U.S.C. § 2901(b). The Secretary of the CDFA is authorized to attend and participate in the meetings where promotional activities are planned, Pistachio Act § 69041, just as the Secretary of Agriculture or his designee may attend the meetings where the Beef Board develops marketing plans, *see* 7 C.F.R. § 1260.168(h). As a practical matter, the Secretary of the CDFA or his representative routinely attends Commission board meetings.

The Secretary of Agriculture approves the Beef Board's detailed plans for promotional or marketing activities. *See* 7 C.F.R. §§ 1260.150(f)-(g) & 1260.169. Similarly, the Pistachio Commission must submit to the Secretary of the CDFA, for his concurrence, "an annual statement of contemplated activities authorized [by the Pistachio Act], including advertising, promotion, marketing research, and production research." Pistachio Act § 69051(q).

Although there is no provision in the Pistachio Act allowing the Secretary of the CDFA to remove members of the Pistachio Commission, *compare Johanns*, 544 U.S. at 563, the Pistachio Act authorizes the Secretary of the CDFA to "correct or cease any existing activity or function that is determined by the secretary not to be in the public interest or in violation of [the Pistachio Act]." Pistachio Act § 69032. And, the Secretary may suspend or discharge the Commission's president if he has engaged in any conduct that the Secretary determines is not in the public interest. *Id.* § 69051(d).

**[6]** Other factors also demonstrate the Secretary's control over the Commission. For example, growers dissatisfied with any Commission activity may file a grievance, which can be directly appealed to the Secretary. *Id.* § 69092. The Secretary also must approve the Commission's annual budget before the Commission may disburse funds, *id.* § 69051(p), and he may conduct a separate fiscal compliance audit whenever he deems such an audit is necessary, *id.* § 69051(h). Given the

similarities to *Johanns* and the level of control vested in the Secretary, Paramount has not yet demonstrated that the Pistachio Commission should be classified as a nongovernmental entity.

Paramount argues that *Johanns* should not apply here because, in practice, the Secretary of the CDFA exercises "no control" over the Pistachio Commission's promotional and marketing activities. In *Johanns*, the Court held that the speech at issue in that case more than met the requirements for qualifying as government speech. *See* 544 U.S. at 563 (holding that "the beef advertisements here are subject to political safeguards more than adequate to set them apart from private messages"). However, *Johanns* did not set a floor or define minimum requirements. *Id.*

[7] At this stage of the proceedings, we cannot say that Paramount is likely to overcome the barrier of *Johanns*. Paramount has not made a sufficient showing that the Secretary of the CDFA exercises inadequate oversight over the activities of the Commission. To be sure, the Secretary of the CDFA exercises less control over the Pistachio Commission than the Secretary of Agriculture exercised over the Beef Board. Nonetheless, the marketing and promotional plans submitted to the CDFA include a significant amount of detail. For example, they include a general description of the advertisements, detail the themes to be emphasized, the actors to be used, the demographics to be targeted, and the media to be employed. Last year's budget noted that the "proposed advertising campaign will feature three generations of [Jane] Seymour's family . . . making the connection that heart disease is not a dicriminator of age, and that California pistachios can be an important part of lifetime heart health." The proposal describes the specific magazines in which the advertisements will run, notes the approximate timing of their publication (in February, to coincide with the Super Bowl, for example), and often includes specific words and imagery to be used. The overall budget also includes specific line-item budgets for

promotional, advertising, marketing, and research activities, a report from a retained private advertising agency that discusses the advertisements generally and each selected publication and promotional activity specifically, and a 15-page overview of the entire public relations strategy, including advertising, marketing, and promotions.

**[8]** Although the Secretary has not rejected or edited proposals, or taken a particularly active role in meetings, this passivity is not an indication that the government cannot exercise authority. *See Johanns*, 544 U.S. at 560 (focusing on effective control). The Secretary, through his staff, retains authority to control both the activities and the message. The fact that he has not played an active role cannot be equated with abdication of his role. Just as "[t]he Secretary of Agriculture does not write [the copy of the beef advertisements] himself" for the Beef Board, neither should such oversight be required for the California scheme to pass constitutional muster. *Id.*

**[9]** We acknowledge that there are differences in actual oversight between the beef scheme and the pistachio scheme, but these factual differences are legally insufficient to justify the injunction. To draw a line between these two approaches to oversight risks micro-managing legislative and regulatory schemes, a task federal courts are ill-equipped to undertake. "The message set out in the [pistachio] promotions is from beginning to end the message established" by the state government. *Id.*[5]

## II. BALANCE OF HARDSHIPS

**[10]** Although, in our view, Paramount has not demonstrated a likelihood of success on the merits, the further question is whether the balance of hardships tips sharply in its

---

[5]Because we rest our analysis on *Johanns*, we decline to reach the district court's resolution of the compelled speech challenge under *Glickman* and *United Foods*.

favor. By bringing a colorable First Amendment claim, Paramount certainly raises the specter of irreparable injury. But simply raising a serious claim is not enough to tip the hardship scales. *See Preminger v. Principi*, 422 F.3d 815 (9th Cir. 2005) (holding that a preliminary injunction was not warranted because plaintiffs had failed to show likelihood of success on the merits of a First Amendment claim and did not demonstrate significant irreparable harm); *Clear Channel*, 340 F.3d at 816-17 (vacating a preliminary injunction where plaintiffs were unlikely to succeed on the merits even though their First Amendment claims did raise the possibility of irreparable injury).

In its hardship analysis, the district court relied exclusively on the potential deprivation of Paramount's First Amendment freedoms to hold that the balance of hardships tipped in favor of Paramount. It also found that neither Paramount nor the intervenors presented evidence that they would experience serious financial or other distress in the event that they were required to continue paying assessments during the course of the litigation. By contrast, the Pistachio Commission has shown that the injunction has resulted in significant hardship. The district court found that because assessments from Paramount might comprise 25 to 30 percent of the Pistachio Commission's revenues, entry of an injunction would likely force the Pistachio Commission to curtail its operations significantly.

**[11]** Because, at this stage, "the underlying constitutional question is [not] close," *Ashcroft*, 542 U.S. at 664, and because the balance of hardships does not tip in Paramount's favor, we hold that the district court erred in granting Paramount's motion for a preliminary injunction. The order granting the preliminary injunction is **REVERSED**; the preliminary injunction is **VACATED**; and the case is **REMANDED** to the district court for further proceedings.