**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DELANO FARMS COMPANY, a
Washington corporation; THE
SUSAN NEILL COMPANY, a
California corporation; LUCAS
BROS PARTNERHSHIP, a California
partnership,
   *Plaintiffs-Appellants,*

   v.

CALIFORNIA TABLE GRAPE
COMMISSION,
   *Defendant-Appellee.*

No. 08-16233

D.C. No.
1:96-cv-06053-
OWW-DLB

OPINION

Appeal from the United States District Court
for the Eastern District of California
Oliver W. Wanger, District Judge, Presiding

Argued and Submitted
April 15, 2009—San Francisco, California

Filed November 20, 2009

Before: Stephen Reinhardt, John T. Noonan and
M. Margaret McKeown, Circuit Judges.

Opinion by Judge McKeown;
Concurrence by Judge Reinhardt

15463

---

**COUNSEL**

Brian C. Leighton (argued), Clovis, California, for the appellants.

Robert D. Wilkinson and Kendall L. Manock, Baker, Manock & Jensen, Fresno, California, for the appellee.

Seth P. Waxman, Randolph D. Moss (argued), Todd C. Zubler, Brian M. Boynton, and Amy Oberdorfer Nyberg, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, DC, for the appellee.

---

**OPINION**

McKEOWN, Circuit Judge:

We are again faced with the question whether a state statutory scheme requiring growers to fund generic advertising for promotion of an agricultural product violates the First Amendment. Here, we consider the case of compelled assess-

ments on California table grape[1] growers, levied through the California Table Grape Commission (the "Commission"). Specifically, we address whether this generic advertising scheme is the government's own speech and is thereby exempt from a First Amendment compelled speech challenge, based on the Supreme Court's analysis in *Johanns v. Livestock Marketing Association*, 544 U.S. 550 (2005), and our decision in *Paramount Land Co. LP v. California Pistachio Commission*, 491 F.3d 1003 (9th Cir. 2007). Because the Commission's promotional activities constitute government speech that is immune to challenge under the First Amendment, we affirm the district court's grant of summary judgment on this ground.

## BACKGROUND

### A.    The Table Grape Commission

The Commission was established in 1967 by an act of the California Legislature (the "Ketchum Act"), Cal. Food & Agric. Code §§ 65500 *et seq*. The Legislature recognized that "[g]rapes produced in California for fresh human consumption comprise one of the major agricultural crops of California, and the production and marketing of such grapes affects the economy, welfare, standard of living and health of a large number of citizens residing in this state." § 65500. Noting that the "inability of individual producers to maintain or expand present markets or to develop new or larger markets for such grapes results in an unreasonable and unnecessary economic waste of the agricultural wealth of this state," the Ketchum Act created the Commission to support the table grape indus-

---

[1] " 'Fresh grapes' also designated 'table grapes' means any and all varieties of grapes produced in the State of California shipped for fresh human consumption, but does not include grapes delivered to a processor for processing or grapes processed by a processor or grapes delivered to a winery for winemaking or grapes produced for use in the making of wine." Cal. Food & Agric. Code § 65523.

try through centralized advertising, marketing, research, and government relations efforts. Cal. Food & Agric. Code § 65572.

The Commission is governed by a regulatory scheme that applies to all state councils and commissions that relate to agricultural and seafood markets. Cal. Food & Agric. Code §§ 63901-63901.3. *See also Paramount Land*, 491 F.3d at 1006 (explaining that California has established a regulatory scheme that applies to many state commissions and councils). The Commission is authorized to undertake a broad range of activities: (1) research into production, food safety, marketing, trend analysis, crop protection and production materials, (2) efforts to secure the elimination of trade barriers, (3) educational outreach about the benefits of table grape usage and consumption, (4) enhancement of the public conception of table grapes to increase overall demand for the product, (5) consumer education relating to environmental protection, (6) cooperative crisis resolution, (7) participation in negotiations with foreign governments, and (8) industry self-regulation. §§ 63901-63901.3, 65500, 65572. *See also Paramount Land*, 491 F.3d at 1006 (describing similar for California Pistachio Commission).

The Commission's work is funded primarily by assessments imposed on all shipments of California table grapes. Cal. Food & Agric. Code § 65604. The Commission prescribes the time and method of payment and directly collects the assessments. § 65604.

The Secretary (the "Secretary") of the California Department of Food and Agriculture (the "CDFA") retains authority over the Commission's activities through a few key functions. All of the commissioners are appointed and subject to removal by the Secretary. Cal. Food & Agric. Code §§ 65550, 65575.1. Any person aggrieved by any action of the Commission may appeal to the Secretary. Cal. Food & Agric. Code § 65650.5. Through this appeal process, the Secretary has the

power to reverse the action of the Commission. § 65650.5. Further, "[u]pon the finding of 11 of the members of the [C]ommission that the operation of the provisions of [the Ketchum Act] has not tended to effectuate its declared purposes," the Commission may recommend to the Secretary that its operation be suspended. Cal. Food & Agric. Code § 65660. The Ketchum Act provides that the Secretary will then conduct a referendum among grape producers to determine if the Commission's operations should be suspended. § 65660.

In addition, like other entities in the state government, the Commission is subject to transparency, auditing, and ethics regulations that aim to promote public accountability. *See e.g.* § 65572 (detailing that the Commission must "keep accurate books, records and accounts of all of its dealings, which books, records and accounts shall be open to inspection and audit by the Department of Finance of the State of California or other state officer charged with the audit of operations of departments of the State of California").

### B.   PROCEEDINGS BELOW

A group of table grape growers, Delano Farms Company, Lucas Brothers Partnership, and The Susan Neill Company (collectively, "Delano Farms"), filed suit against the Commission in 1996, objecting "to being compelled by state law to pay money for generic advertising campaigns." *Delano Farms v. Cal. Table Grape Comm'n* ("*Delano Farms I*"), 318 F.3d 895, 896 (9th Cir. 2003). The generic advertising to which Delano Farms objects focuses on the idea that fresh California table grapes are consumed primarily as a snack and are a healthy alternative for consumers, as opposed to other snack options like ice cream, chips, french fries, and buttered popcorn. The Commission popularizes this sentiment mainly through outdoor billboards and radio commercials.

Delano Farms maintains that the Commission's advertising efforts harmfully equate all table grapes, by virtue of the "ge-

neric" advertisements. Because the advertisements suggest that all table grapes are fungible and of the same quality, Delano Farms believes that the advertisements hurt Delano Farms's ability to distinguish its product from its competitors. Delano Farms also objects to supporting efforts it finds unnecessary or overly lavish, citing examples of travel and benefits to the Commission's employees, parties, and scholarship funds. As a consequence of a hefty assessment—$600,000 annually—Delano Farms argues that it has less money to put towards its own promotional and other activities.

Delano Farms sought "a declaratory judgment that the assessments violated their First Amendment rights, an injunction against collection, and for refunds." *Delano Farms I*, 318 F.3d at 896. The district court rejected Delano Farms's claim, determining that the assessment scheme is constitutional.

In the growers' first appeal *Delano Farms I*—we considered the district court's decision in the context of two then-recently decided Supreme Court cases *Glickman v. Wileman Brothers & Elliott*, 521 U.S. 457 (1997), and *United States v. United Foods, Inc.*, 533 U.S. 405 (2001). As *Delano Farms I* explains, in *Glickman*, the Supreme Court considered a challenge to federal marketing orders that charged an assessment to tree fruit growers; "the Supreme Court held that the assessments did not violate the First Amendment rights of the dissenting growers not to be forced to pay for speech in which they preferred not to participate." *Delano Farms I*, 318 F.3d at 898 (internal citation omitted). The Court reasoned that the generic advertising was "part of a broader collective enterprise in which [the growers'] freedom to act independently is already constrained by the regulatory scheme." *Id.* (quoting *Glickman*, 521 U.S. at 469).

*Delano Farms I* noted that *United Foods*, a later Supreme Court case, "went the other way." *Delano Farms I*, 318 F.3d at 898. The assessment at issue in *United Foods* concerned a

program of compelled subsidies in the mushroom industry. *Id.* (internal citation omitted). We noted in *Delano Farms I* that the Supreme Court struck down the assessment scheme as unconstitutional; because in *United Foods* unlike in *Glickman*, there was no such " 'comprehensive program,' just a scheme that consisted mostly of generic promotion of mushrooms." *Delano Farms I*, 318 F.3d at 898 (internal citation omitted).

We thus considered in *Delano Farms I* whether the Ketchum Act fell "on one side or the other of the *Glickman-United Foods* distinction." *Delano Farms I*, 318 F.3d at 899. On the basis of the initial pleadings, we determined that the Ketchum Act does not collectivize the industry in the same manner as the tree fruit order at issue in *Glickman*. *Delano Farms I*, 318 F.3d at 899. Reasoning that the "statute [is] similar to the one at issue in *United Foods*," we revived the suit, deeming Delano Farms "entitled to First Amendment protection against state compulsion to fund generic advertising." *Delano Farms I*, 318 F.3d at 899-900.

The parties returned to the district court and resumed litigation. On remand, the Commission amended its answer to allege that its speech and promotional activities are government speech and are, therefore, not susceptible to a First Amendment challenge. The parties agreed to suspend discovery when the Supreme Court granted certiorari in *Johanns*, a case involving compelled assessments in the beef market. In *Johanns*, the Supreme Court decided the case in favor of the Beef Board, resting on the same theory that the Commission had added to its answer on remand: the mandatory assessments for beef promotion went to fund government speech, and thus were immune to challenge on First Amendment grounds. *Johanns*, 544 U.S. at 560-62.

Following the Supreme Court's decision in *Johanns*, both sides moved for summary judgment. The district court granted summary judgment to the Commission on the key

question in this litigation—whether the Commission's activities are government speech such that they are insulated from First Amendment scrutiny. The district court first held that because the Commission is a government entity, its speech is necessarily that of the government. In the alternative, the district court held that the State has "effective control" over the Commission's message, such that under *Johanns*, the Commission's activities are government speech.[2]

## ANALYSIS

**[1]** We now consider Delano Farms's First Amendment claim with the benefit of the Supreme Court's decision in *Johanns*. 544 U.S. at 553; *see also Paramount Land*, 491 F.3d at 1010-12. The Commission's activities may be classified as government speech, unencumbered by the bounds of the First Amendment, in either of two ways: (1) if the Commission is itself a government entity, or (2) if the Commission's message is "effectively controlled" by the State, *see Johanns*, 544 U.S. at 560-61. We conclude that the Commission's activities are government speech, taking into consideration both avenues for classification of such speech.

## I.   TABLE GRAPE COMMISSION AS GOVERNMENT ENTITY

Whether the Commission, a state-created body, is a government entity for First Amendment purposes is a question we consider in light of the Supreme Court's guidance in *Keller v. State Bar of California*, 496 U.S. 1 (1990) and *Lebron v. National Railroad Passenger Corp.*, 513 U.S. 374 (1995). We conclude that the scale tips to classifying the Commission as a government entity.

Oddly, in its brief, Delano Farms is dismissive of govern-

---

[2]Because we rest our decision on government speech, we do not reach the district court's resolution of the compelled speech challenge under *Glickman* and *United Foods*.

ment entity status as a basis for First Amendment immunity—
"The Commission and the court below relied upon the weak
fact that the Commission itself is a government entity. That's
hardly little that matters when it comes to government
'speech' . . . ." According to Delano Farms, the Court in
*Johanns* would not have engaged in extensive discussion of
government oversight of the beef program if government
entity status were an easy resolution to the case. In *Johanns*,
however, the Court explicitly declined to address whether the
Operating Committee—the entity that creates the beef
messaging—was a governmental or nongovernmental entity.
*See id.* at 560 n.4. Instead, the Court noted that the Secretary
appoints all of the members of the Beef Board—the entity to
which assessments are remitted—and concluded that the Sec-
retary effectively controlled the Operating Committee's mes-
saging. *Id.* at 560 n.4, 561-62. But, *Johanns* is unambiguous
that the governmental entity-nongovernmental entity dichot-
omy is relevant in a compelled subsidy challenge under the
First Amendment. *See* 544 U.S. at 560 n.4. Thus, the govern-
mental entity analysis remains a viable ground for determin-
ing exemption from the First Amendment. And, this case
presents a cleaner statutory scheme in which to do so because
the Commission acts, in effect, as both Beef Board and Beef
Operating Committee. In other words, all of the Ketchum Act
functions are performed by a single entity, the Commission,
whose commissioners are all appointed by the Secretary.

In *Keller*, the Court considered a First Amendment chal-
lenge brought by attorneys who objected to the State Bar of
California's expenditure of mandatory dues on political and
ideological campaigns. 496 U.S. at 4. The State Bar's first
line of defense was that it is a government actor and is thus
immune to a challenge under the First Amendment concern-
ing how it chooses to express itself. In rejecting this argu-
ment, the Court emphasized several characteristics of the
mandatory California Bar that distinguish it from a govern-
ment actor: (1) its funding comes principally from dues levied
on members rather than general appropriations; (2) its mem-

bers are solely lawyers, all of whom are required to join; (3) its role is primarily advisory (e.g. the courts are responsible for managing admission to practice and for disciplinary action); and (4) as opposed to government officials, who "are expected as a part of the democratic process to represent and to espouse the views of a majority of their constituents," the organization "was created, not to participate in the general government of the State, but to provide specialized professional advice to those with the ultimate responsibility of governing the legal profession." *Id.* at 11-13. In light of these factors, the Supreme Court resolved that the State Bar is not a governmental entity whose own speech is immune to constitutional challenge. *Id.* at 12.

**[2]** If *Keller* alone were the law, the Commission's argument that it is a government entity would be a tougher sell. Like the State Bar, the Commission is funded by mandatory private assessments, and those paying the assessments come exclusively from a single industry. § 65604. While the Commission's role is more than merely advisory, it arguably focuses on a particular constituency, rather than the broader citizenry of California. *Cf. R.J. Reynolds Tobacco Co. v. Shewry*, 423 F.3d 906, 918 (9th Cir. 2005) (holding that a promotional campaign designed by the California Department of Health Services and funded by an excise tax on tobacco companies was "government speech," because "[w]hen California uses funds from the tobacco surtax to produce advertisements, it does so in the name of all of California's citizens," while the arrangement in *Keller*, along with entities considered in other cases, "represent[ed] only the interests of [a] particular entity").

A few years after *Keller*, however, the Supreme Court considered another case involving the question whether an entity should be considered to be part of the federal government for First Amendment purposes, *Lebron v. Amtrak*, 513 U.S. 374. Although *Lebron* also involved an inquiry into whether Amtrak was a governmental entity, the question before the

Court was very different from that at issue in *Keller.* In *Keller*, the question was whether the State Bar's speech was governmental speech and therefore immune from constitutional challenge, because the government is not required to be impartial when speaking, as long as its speech is consistent with the Establishment and Equal Protection clauses. *See Johanns v. Livestock Marketing Assn.*, 544 U.S. 550, 553 (2005) ("[T]he Government's own speech . . . is exempt from First Amendment scrutiny"); *Columbia Broadcasting System, Inc. v. Democratic National Committee*, 412 U.S. 94, 139, n. 7 (1973) (Stewart, J., concurring) ("Government is not restrained by the First Amendment from controlling its own expression"). Although the government's own speech is immune from constitutional challenge, it is nonetheless accountable under the First Amendment when it suppresses the speech of others. *See Pleasant Grove City, Utah v. Summum*, ___ U.S. ___ 129 S. Ct. 1125, 1132 (2009) ("While government speech is not restricted by the Free Speech Clause, the government does not have a free hand to regulate private speech on government property.") The government is required to provide neutral access to public fora—i.e. it may not privilege one religious or political viewpoint over another and it may not prevent individuals from expressing their opinions, just because it disagrees with them. The denial of access would violate the First Amendment right to freedom of expression of the individuals whose right to speak was curtailed. *See Carey v. Brown*, 447 U.S. 455, 463(1980).

In *Lebron*, the Court considered whether Amtrak was a government entity and could therefore be sued when it curtailed the speech of an individual who wanted to display a political message on a billboard in Pennsylvania Station. *Lebron*, 513 U.S. at 376-77. In determining that Amtrak was a government entity, the Court explained that Congress established Amtrak for "public convenience and necessity." *Id.* at 384 (internal quotation omitted). Congress created Amtrak as a corporation and gave the President the power to appoint the majority of Amtrak's board members. *See id.* at 384-85.

Viewing Amtrak as one in a "long history of corporations created and participated in by the United States for the achievement of government objectives," *id.* at 386, the Court held that "where, as here, the Government creates a corporation by special law, for the furtherance of government objectives, and retains for itself permanent authority to appoint a majority of the directors of that corporation, the corporation is part of the Government for purposes of the First Amendment." *Id.* at 400. As a result, Amtrak's refusal to display a sign made by the plaintiff was a decision that could be reviewed under the First Amendment. *Id.*

**[3]** Like Amtrak, the Commission was created by the California Legislature as a corporation. Cal. Food & Agric. Code § 65551. It was also established to further governmental objectives. § 65500(h) ("The production and marketing of grapes produced in California for fresh human consumption is declared to be affected with a public interest; the provisions of this chapter are enacted in the exercise of the police power of this state for the purpose of protecting the health, peace, safety and general welfare of the people of this state."). This invocation of the State's police power to protect health and safety contrasts with the general "public interest" goal advanced by the State Bar in *Keller*. *See Keller*, 496 U.S. at 13. Although the subsidy targets a specific industry, the Commission's focus is, unlike the Bar Association's not on professional advice for its members but rather a broader purpose of addressing the "unreasonable and unnecessary economic waste of the agricultural wealth" of California. § 65500(e). Significantly, the Secretary of the CDFA has the power to appoint all of the commissioners, similar to the President's power vis a vis Amtrak. §§ 65550, 65563, 65566, 65575.1. The Commission correctly points out that the Secretary has an additional important power over the Commission—the authority to remove a commissioner—that the President does not possess over Amtrak.

Delano Farms's assertion that *Lebron* applies only when an entity should be constrained by the First Amendment, and not

when an entity defensively seeks immunity from suits brought under the First Amendment, finds no support in *Lebron*. The Court's statements of the issue in *Lebron* and *Johanns*, both authored by Justice Scalia, are strikingly similar. In 1995 in *Lebron*, Justice Scalia wrote: "[W]e consider whether the actions of . . . Amtrak [ ] are subject to the constraints of the Constitution." 513 U.S. at 376. Ten years later in *Johanns*, Justice Scalia explained: "[W]e consider whether a federal program violates the First Amendment . . . the dispositive question is whether the generic advertising . . . is the Government's own speech and therefore is exempt from First Amendment scrutiny." 544 U.S. 553. Nothing in *Lebron* suggests that the government entity analysis was limited to an offensive plaintiff posture. Rather, *Lebron*, like *Johanns*, speaks generally to whether the speech is government speech "for purposes of the First Amendment." *Lebron*, 513 U.S. at 400.

**[4]** Nevertheless, there is admittedly an uncharted gap between *Keller* and *Lebron*. Were we to decide this appeal based solely on whether the Commission is a government entity, *Lebron* and the strong indicia of governmental status and control would tip the balance to classifying the Commission as a governmental entity. Under the circumstances here, however, this question is closely related to the government control question. Because the Commission's activities are effectively controlled by the State of California, also rendering them government speech, the bottom line remains the same—the Commission's advertising activities are government speech and thus beyond the restraints of the First Amendment.

## II.    THE STATE'S "EFFECTIVE CONTROL" OVER THE TABLE GRAPE COMMISSION'S ACTIVITIES

Regarding the inquiry whether the Commission's message is "effectively controlled" by the state government, we turn to

the Supreme Court's decision in *Johanns* and our decision in *Paramount Land*.

## A.   *Johanns v. Livestock Marketing Association*

In *Johanns*, the Supreme Court considered the constitutionality of the Beef Promotion and Research Act of 1985 (the "Beef Act"), Pub. L. No. 99-198, 99 Stat. 1597 (1985). The Beef Act furthers a federal policy of promoting the marketing and consumption of beef and beef products and funds those activities through assessments on cattle sales and imports. *See Johanns*, 544 U.S. at 553. "The statute directs the Secretary of Agriculture to implement this policy by issuing a Beef Promotion and Research Order," *id.*, ("Beef Order"), and specifies that the Secretary should appoint a Beef Board that is to convene an Operating Committee that is composed of 10 Beef Board members and 10 representatives named by state beef councils. *Id.* (citing 7 U.S.C. § 2904(4)(A)). The Operating Committee is to design promotional campaigns, which are approved by the Secretary before their release. *Id.*

[5] The Court held that the Operating Committee's promotional activities constitute the government's own speech because the message is effectively controlled by the federal government. *Johanns*, 544 U.S. at 560-61. In so holding, the Court recognized three key factors about the program. First, Congress directed the creation of the promotional program and specified that the program should include "paid advertising, to advance the image and desirability of beef and beef products." *Id.* at 560 (quoting 7 U.S.C. §§ 2901(b), 2902(13)) (internal quotations omitted). Second, "Congress and the Secretary have also specified, in general terms, what the promotional campaigns shall contain . . . and what they shall not . . ." *Id.* at 561 (internal citations omitted). Specifically, the campaigns should not refer to brand or trade names of any beef product. *Id.* "Thus, Congress and the Secretary have set out the overarching message and some of its elements, and they have left the development of the remaining details to an

entity whose members are answerable to the Secretary (and in some cases appointed by him as well)." *Id.* Finally, "the record demonstrate[d] that the Secretary exercises final approval authority over every word used in every promotional campaign." *Id.* The Court, therefore, held that the Beef Board and the Operating Committee could rely on the government speech doctrine to deflect the cattle associations' challenge. *Id.* at 562.

### B. *Paramount Land Co. LP v. California Pistachio Commission*

**[6]** Following *Johanns*, in *Paramount Land*, we applied these principles to a First Amendment challenge to the California Pistachio Commission. *Paramount Land*, 491 F.3d at 1010. Like the Beef Act, the California Legislature enacted the Pistachio Act and created the Pistachio Commission to promote the economic interests of the State. *Id.* at 1006 (citing Cal. Food & Agric. Code § 63901). "The Pistachio Commission is directed to 'promote the sale of pistachios by advertising and other promotional mean[s] . . . ." *Id.* at 1010 (Cal. Food & Agric. Code § 69051(i). Only one of the nine members of the Pistachio Commission is appointed by the Secretary of the CDFA. The other eight pistachio commissioners are selected by California pistachio growers. *Id.* at 1006 (citing § 63901).

Although the Pistachio Commission creates the specific messaging based on the Legislature's general directive, more significant to the question of the State's control, "the Pistachio Commission must submit to the Secretary of the CDFA, for his concurrence, 'an annual statement of contemplated activities authorized [by the Pistachio Act], including advertising, promotion, marketing research, and production research.' " *Id.* at 1010 (quoting § 69051(q)). In addition, the Secretary retains "broad statutory authority" to attend and participate in Pistachio Commission meetings; to review the Pistachio Commission's budget and planned activities; to

conduct audits; to approve nomination and election proce-
dures; to decide appeals from grievances brought by growers;
and to suspend or discharge the Pistachio Commission's pres-
ident. *Id.* at 1010-11 (citing Cal. Food & Agric. Code
§§ 69051, 69069, 69092).

**[7]** Ultimately, we determined that the pistachio growers'
challenge should be resolved in the same way as the beef pro-
gram in *Johanns*. *Paramount Land*, 491 F.3d at 1010. We rec-
ognized that the discussion of the specifics of the beef
promotion program in "*Johanns* did not set a floor or define
minimum requirements." *Paramount Land*, 491 F.3d at 1011.
And, comparing the Beef Act and the Pistachio Act, we held
that the differences in statutorily provided oversight were "le-
gally insufficient" to distinguish the Pistachio Act from the
Beef Act, reasoning that "[t]o draw a line between these two
approaches to oversight risks micro-managing legislative and
regulatory schemes, a task federal courts are ill-equipped to
undertake." *Id.* In short, we held that the message of the Pista-
chio Commission is "from beginning to end the message
established by the State." *Id.*

## C.   *Johanns* and *Paramount Land* Applied to the Table Grape Commission

The framework of statutes governing the Commission is
sufficiently similar to the schemes addressed in *Johanns* and
*Paramount Land* for us to conclude that the State exercises
effective control over the Commission's activities. In other
words, the Commission's message is "from beginning to end"
that of the State. *See Paramount Land*, 491 F.3d at 1012
(quoting *Johanns*, 544 U.S. at 560).

**[8]** The founding of the Commission, its structure, and its
relationship to the State of California is strikingly similar to
the beef program at issue in *Johanns* and the Pistachio Com-
mission considered in *Paramount Land*. Like the beef pro-
gram and the Pistachio Commission, the Commission was

established by an act of the Legislature, the Ketchum Act. §§ 65500 *et seq*. The California Legislature intended for the Commission, like other commissions established by the State, to "[i]mplement public policy through their expressive conduct." § 63901(a). The Commission is tasked with "[e]nhance[ing] the image of California agricultural and seafood products to increase the overall demand for these commodities." § 63901(e). Also similar to the beef program in *Johanns* and identical to the Pistachio Commission in *Paramount Land*, the Legislature provided an overriding directive for the sorts of messages the state commissions should promote: "[T]he Legislature intends that the commissions and councils operate primarily for the purpose of creating a more receptive environment for the commodity and for the individual efforts of those persons in the industry, and thereby complement individual, targeted, and specific activities." § 63901(e).

The California Legislature was quite specific about its expectations for the Commission and its messaging. The Legislature declared that "[g]rapes produced in California for fresh human consumption comprise one of the major agricultural crops of California, and the production and marketing of such grapes affects the economy, welfare, standard of living and health of a large number of citizens residing in this state." § 65500(a). The Legislature further defined the purpose of the Commission's work by declaring that the Commission should focus on:

> [t]he promotion of the sale of fresh grapes for human consumption by means of advertising, dissemination of information on the manner and means of production, and the care and effort required in the production of such grapes, the methods and care required in preparing and transporting such grapes to market, and the handling of the same in consuming markets, research respecting the health, food, and dietetic value of California fresh grapes and the production,

> handling, transportation, and marketing thereof, the dissemination of information respecting the results of such research, instruction of the wholesale and retail trade with respect to handling thereof, and the education and instruction of the general public with reference to the various varieties of California fresh grapes for human consumption, the time to use and consume each variety and the uses to which each variety should be put, the dietetic and health value thereof . . .

§ 65500(f). The specifics contained in § 65500(f) go much further in defining the Commission's message than the Beef Act and Beef Order's general directive that the Operating Committee's programming should discuss different types of beef and that it should refrain from using brand names. *See Johanns*, 544 U.S. at 561.

Like the Operating Committee in *Johanns* and the Pistachio Commission in *Paramount Land*, the Commission is tasked with developing specific messaging campaigns. Importantly, the Secretary of the CDFA possesses the power of nomination over all of the table grape commissioners. §§ 65550, 65575.1. The Secretary's power in this respect is greater than either the Secretary of Agriculture's power in *Johanns* (the Secretary has the power to appoint all Beef Board members, but only half of the Operating Committee, *see Johanns*, 544 U.S. at 560) or the Secretary of the CDFA's power in *Paramount Land* (eight pistachio commissioners are elected by industry and only one is appointed by the Secretary of the CDFA, *see Paramount Land*, 491 F.3d at 1006). The Secretary also has the power to remove a table grape commissioner. §§ 65550, 65575.1. The State possesses additional oversight powers over the Commission, as the Commission is required to "keep accurate books, records, and accounts of all of its dealings" and must make those records open to review by the State. § 65572(f).

**[9]** Of course, there are some important differences between the Ketchum Act on the one hand and the programs considered in *Johanns* and *Paramount Land* on the other. Unlike the Beef Order and the Pistachio Act, the Ketchum Act does not *require* any type of review by the Secretary over the actual messages promulgated by the Commission. Under the Beef Order, the Beef Board and Operating Committee send all plans to the Secretary for final approval. 7 C.F.R. §§ 1260.68 & 1260.169. Likewise, the Pistachio Commission must "submit to the secretary, for his or her concurrence, an annual statement of contemplated activities . . . including advertising, promotion, marketing research, and production research." § 69051(q). We recognize that final approval has been statutorily provided to the relevant secretaries in other commodities programs that courts have approved since *Johanns. See Am. Honey Producers Assoc., Inc. v. U.S.D.A.*, 2007 WL 1345467, at *2 (E.D. Cal. May, 8, 2007) (determining that honey program funded by industry assessments involved government speech and was therefore immune to constitutional challenge, the court noted that the Act includes a provision that gives the Secretary final approval power over messages before they can be disseminated to the public); *Avocado Plus, Inc. v. Johanns*, 421 F. Supp. 2d 45, 47-48 (D.D.C. 2006) (same, for avocado program); *Cricket Hosiery, Inc. v. United States*, 429 F. Supp. 2d 1338, 1346 (Ct. Intl. Trade 2006) (same, for cotton program). We do not discount the significance of the power over specific messaging.

**[10]** An additional noteworthy difference between the Ketchum Act and the Pistachio Act, in particular, concerns the Secretary's power to "require the [Pistachio] commission to correct or cease any existing activity or function that is determined by the secretary not to be in the public interest or to be in violation of this chapter." Cal. Food & Agric. Code § 69032. The Ketchum Act does not grant a similar power to the Secretary. Rather, under Cal. Food & Agric. Code § 65660, the Commission may recommend to the Secretary that its operation be suspended, or producers may file a peti-

tion with the Secretary recommending the same. At that point, the Secretary causes a referendum to be conducted among producers. § 65660. Although less direct, this route for review still involves the Secretary in the oversight process. And, of course, the ultimate power of review and oversight—the Secretary's authority to remove table grape commissioners—cannot be discounted.

The bulk of Delano Farms's remaining arguments distinguishing the State's effective control over the Commission as compared to the beef program and the Pistachio Act largely rely on pointing out that the Secretary and the CDFA have, in practice, performed virtually no supervision of the Commission. Delano Farms notes that the Secretary does not attend meetings and does not review advertising and promotional activities, nor does the State review the Commission's budgets. The record also reflects that the CDFA had very few documents in its possession related to the Commission's work. In any event, Delano Farms's laissez-faire argument is foreclosed by *Paramount Land*, in which we underscored that "passivity is not an indication that the government cannot exercise authority." 491 F.3d at 1011. Our focus in this case, as in *Paramount Land*, is the statutorily-authorized control the State has over the Commission, and not the actual level of control evidenced in the record.

**[11]** While we acknowledge that there are differences in statutorily-prescribed oversight afforded to the government in the case of the Commission, the beef program, and the Pistachio Commission, these differences are legally insufficient to justify invalidating the Ketchum Act on First Amendment grounds. In sum, we are mindful of *Paramount Land*'s admonition that "[t]o draw a line between these . . . approaches to oversight risks micro-managing legislative and regulatory schemes, a task federal courts are ill-equipped to undertake." *Paramount Land*, 491 F.3d at 1012.

## CONCLUSION

**[12]** The district court did not err in granting summary judgment to the Table Grape Commission on the ground that its promotional activities constitute government speech and are thus immune to challenge under the First Amendment. We AFFIRM the district court's grant of summary judgment to the Table Grape Commission on this dispositive issue.

**AFFIRMED**.

---

REINHARDT, Circuit Judge, concurring in part:

I concur in the majority opinion up to the concluding paragraph of Part I. Rather than finding any "uncharted gap" or performing any "tip[ping of] the balance," I would simply conclude that the Commission is a government entity and that its speech is therefore government speech. For that reason, I find Part II wholly unnecessary to the opinion, and would not reach the question of government control. I express no view as to any discussion or holdings contained in Part II.